WILLIAM H. SMITH, Appellant, v. ROLLA WELLS, Receiver of UNITED RAILWAYS COMPANY of St. Louis.—31 S. W. (2d) 1014.

Division One, October 14, 1930.

*Everett Hullverson* and *Mark D. Eagleton* for appellant.

*T. E. Francis, E. P. Walsh* and *Hensley, Allen & Marsalek* for respondent.

SEDDON, C.—Plaintiff (appellant here) commenced this action on September 13, 1924, in the Circuit Court of the City of St. Louis, to recover, from the defendant receiver, damages in the sum of $15,000 for personal injuries alleged to have been occasioned through the defendant's negligent operation of a street car, resulting in a collision between the defendant's street car and a Ford automobile, owned by plaintiff and operated at the time by plaintiff's wife, said collision occurring on September 6, 1924. A trial and submission of the action to a jury resulted in a unanimous verdict in favor of the defendant. After an unavailing motion for a new trial, plaintiff was allowed an appeal to this court from the judgment entered upon the verdict.

The petition avers, in substance and effect, that on September 6, 1924, plaintiff was riding in an automobile which was proceeding eastwardly along Eichelberger Avenue, a public street in the city of St. Louis, and when said automobile was at or near the intersection of said Eichelberger Avenue with Broadway, another public street in said city, it was then and there, with great force and violence, run into, and collided with, by one of defendant's street cars, directly causing plaintiff to sustain the bodily injuries for which he seeks recovery of damages. The petition charges defendant with negligence in seven respects, but five of the specifications or assignments of negligence were abandoned by plaintiff upon the submission of the cause to the jury, the cause being submitted by plaintiff solely upon the two charges, or assignments, that defendant was negligent in the operation of said street car under the last-chance, or humanitarian, rule and doctrine, and in violating the so-called "Vigilant Watch Ordinance," effective and operative in the city of St. Louis.

The answer is a general denial, coupled with the following pleas:

"For further answer and defense, defendant says that whatever injuries plaintiff may have sustained, if any, were caused by his own carelessness and negligence directly contributing thereto, in allowing and permitting himself to be driven toward and upon a street railway track and immediately in front of and in close and dangerous proximity to an approaching street car when he saw and heard, or by the exercise of ordinary care could have seen and heard, the approaching street car in time thereafter to have avoided the collision.

"For further answer and defense, defendant says that whatever injuries plaintiff may have sustained, if any, were caused by his own carelessness and negligence directly contributing thereto in failing to warn the driver of the automobile in which he was riding when he saw and knew, or by the exercise of ordinary care could have seen and known, that she was driving said automobile toward

and upon a street railway track and immediately in front of and in close and dangerous proximity to an approaching·street car.''

No reply is shown by the record to have been filed by plaintiff, but the cause was tried as though a reply, denying generally the specific averments of the answer, had been filed by plaintiff.

The evidence tends to show the following substantive facts and circumstances:

Eichelberger Avenue is an east-and-west public street within the corporate limits of the city of St. Louis, and terminates at Broadway, a north-and-south public street within the corporate limits of said city. The vehicular roadway of Eichelberger Avenue is approximately thirty or thirty-five feet in width, between the curb-lines.. The defendant receiver maintained and operated a double-track street car line in and along Broadway, the westerly track being used by southbound cars, and the easterly track being used by north-bound cars. The intersection of the two public streets aforesaid is in a sparsely settled and uncongested district of the city. A house, or building of some kind and character, is situate on or near the northwest corner of the intersection, but there are only four or five houses situate northwardly of the intersection, and on the west side of Broadway, for a distance of some three blocks north of the intersection. A ''slow-hazard'' sign was erected and maintained on the south, or right-hand, side of Eichelberger Avenue, some ten or fifteen feet west of the west curb-line of Broadway, which sign served as a warning or danger signal to the operators of vehicles moving eastwardly on Eichelberger Avenue, toward the intersection with Broadway. On September 6, 1924, a bright, sunny day, plaintiff and his wife were traveling eastwardly along Eichelberger Avenue in a Ford touring automobile, and, while attempting to cross the intersection of Eichelberger Avenue with Broadway, the Ford automobile in which plaintiff was riding was struck by a southbound electric street car, operated by defendant receiver, while the automobile was crossing over the west, or southbound, street car track on Broadway. The Ford automobile, according to plaintiff's testimony,. had been purchased by plaintiff on the day immediately before the collision. The automobile was operated, at the time of the collision, by plaintiff's wife, and plaintiff was seated on the front seat of the automobile, and to the right of his wife. According to the testimony of plaintiff and his wife, the couple had driven the automobile to the place of residence of the mother of plaintiff's wife, where the couple had visited for a time, and they were returning from such visit to their home in St. Louis. Plaintiff had himself operated the automobile in going to the home of his mother-in-law, but plaintiff's wife operated the automobile on the return trip.

Plaintiff testified respecting the collision, as follows:

"On September 6, 1924, my wife was driving an automobile, and I was injured. This accident took place at Broadway and Eichelberger Avenue. We were in a Ford touring car. I got it the day before the accident. The car (automobile) was in good condition, brakes and engine in good condition. When we pulled up to Broadway, we were going about fifteen or twenty miles an hour. My wife had driven the machine, as well as I remember, home from South Affton. When I first saw the street car, I judge the automobile was about fifteen feet, maybe farther than that, from Broadway. The street car, I judge, was about three-quarters of a block, or a block, from the intersection with Eichelberger Avenue, north of the north curb of Eichelberger Avenue. There is a 'slow-hazard' sign at that intersection, as you approach Broadway on Eichelberger Avenue, and my wife made a complete stop there, just for a second, or two or three seconds, and then she started on across Broadway to the east side of Broadway. When I saw the street car again, I was about six or eight or ten feet from the street car track, and the car then was about 150 or 175 feet north of me, if not farther. When I first saw it, the street car was coming about ten or fifteen miles per hour—it seemed to be about that fast. The second time I saw it, it seemed as though it was going faster, as if it had increased the speed. That was right about the time it hit us. I saw it the first time when it was about three-fourths of a block away, and then I saw it when it was about 150 or 175 feet away. When it seemed as though it had increased its speed is when the street car hit us. Both front wheels of the automobile were just about—had crossed, probably—the east rail of the southbound track, when the street car hit us. The street car pushed us south, I judge, about thirty or forty feet. We were straddle of the west rail of the southbound track when it stopped. The front end of the street car, after the accident, was thirty-five to forty feet south of the south side of Eichelberger Avenue."

Cross-examination: "This was the first day my wife had driven this car (automobile). Prior to that I had a Ford truck, and before that, a Dodge touring car. When my wife and I went out to my mother-in-law's that day, I drove as far as Mehlville, and she drove the rest of the way. She drove in (returning) all the way. As we approached Broadway, she was driving about twenty miles per hour, up to this 'slow-hazard' sign, which is about fifteen feet back of the west curb of Broadway, and it was about there when I saw the street car about a block, or three-quarters of a block, north of Eichelberger Avenue. I judge the speed of the car at that time to be about ten to twelve miles per hour, and then I saw the street car again when it was 150 or 175 feet away, and, at that time, I was six or eight feet from the track. The car had increased speed at that time. I can't say how fast it was going when I was about six or eight feet

from the track. Our automobile was going about eight or ten miles per hour, and we were driving about two feet from the south side of Eichelberger Avenue, which is about a 30 or 35-foot street. From the time we were six or eight feet from the track, and the street car was 150 or 175 feet north of Eichelberger Avenue, we proceeded on until the front wheels of the automobile were about to the east rail of the southbound track, when the collision occurred. Our automobile traversed this six or eight feet, and approximately five feet, the distance between the rails, a total of eleven or twelve feet, while this street car came down from its position where I saw it the second time, to where the accident occurred. About the time I saw the street car was coming, our automobile was going from low into high gear, and continued on at practically the same speed until we were hit. While the automobile went the ten or eleven or twelve feet, the street car came from a point 150 or 175 feet north of Eichelberger Avenue. The distance between the north side of our automobile and the curb on the north side of Eichelberger Avenue would be about 27 to 32 feet. Q. So, then, from the time you were six or eight feet from the track to the time of the collision, the street car had to run this 150 or 175 feet, and the thirty feet, the distance between the north side of your automobile and the north side of Eichelberger Avenue, which would make 180 to 205 feet, while you were going ten, eleven, or twelve feet: that is correct, isn't it? A. I take it for granted. Q. Well, one hundred and fifty and thirty is one hundred and eighty; it would have to come that distance while you were going ten or eleven feet at least, wouldn't it? A. Yes, sir. Q. If it (the street car) traveled 180 feet while you were traveling ten, then it would have to be going eighteen times as fast as you were going, wouldn't it? A. Yes, sir. Q. It would have to come from a point eighteen times as far away, and it would have to be coming eighteen times as fast, isn't that correct? A. Yes, sir. Q. So, then, if you were going ten or twelve miles an hour, and the street car was going eighteen times as fast as you were, the street car would be going eighteen times ten, or 180 miles an hour, to cover that distance in the same time you did, wouldn't it? A. If I was right; I never measured the exact feet. Q. When the front wheels of your automobile got to the westernmost rail of the southbound track, where was the street car? A. It was right at us then. Q. I asked you how far away from you it was. A. Must have been three or four feet because— Q. (Interrupting): Now, you say, when the front of your automobile got to the first rail, the street car was then within three or four feet of you? A. I don't know how far it was. Q. Well, you were sitting on the right-hand side of the automobile, weren't you? A. Yes, sir. Q. And you had seen that street car when it was almost a block away? A. Yes, sir. Q. And you

had seen it when it was 150 or 175 feet away? A. Yes, sir. Q. And there wasn't anything to obstruct your view north on Broadway, was there? A. Not after we got out in Broadway there wasn't; no. Q. Now, there is nothing there on that corner, the northwest corner, to obstruct your view back some distance when you looked north on Broadway? A. Absolutely not; if there would have been, I never could have seen the street car. Q. Wasn't anything to keep you from looking north? A. Not at 12 or 15 feet from the corner. Q. Anyhow, up to fifteen feet from the corner you could see quite a considerable distance north on Broadway? A. Yes, sir. Q. Now, when the street car and automobile came to a stop, after the collision, where was your automobile with reference to the front end of the street car? A. When they came to a full stop, the street car and the machine (automobile) were coupled together. Q. What portion of the street car was in contact with what portion of the automobile? A. It was the right front, right corner of the front end of the street car, that was fastened into the left side of the Ford touring automobile. Q. Now, when you saw this street car coming down there, did you say anything to your wife, who was driving the car at that time? A. I don't remember that now, whether I said anything to her or not. Q. Did you see her look towards the car? A. I noticed her look north, naturally, as anybody would; you could see anybody turn and look north and south, to see if the tracks are clear, or the road was clear. Q. That is the time you first saw the street car up there, and you knew that it was coming? A. Yes, sir. Q. It was in plain view, so that anybody could see it by looking up there, wasn't it? A. Yes, sir.''

Plaintiff's wife testified:

''I was driving the automobile in which he (plaintiff) was riding. As I approached Broadway, I was traveling about twelve or thirteen miles (per hour), something like that, and made a stop at a 'hazard' sign there. When I got to Broadway, coming over Eichelberger Avenue, I made a stop for a second or two, and I looked north and south to see if there was any traffic coming, and I never saw any, and I started the machine (automobile) again, to go across Broadway. When I first noticed the street car, I was about twelve feet from the 'hazard' sign. The street car then was about three-quarters of a block north of me. It seemed to be coming nine or ten miles per hour. After I had made that stop there, I started up again to go right on all the way across Broadway, as I wanted to turn north on Broadway towards home. I put my machine in low, and when I got within about twelve feet or eleven feet of the rail there, where the Broadway street car goes south, I looked again to see whether there was a street car coming, and then I started on across the track.

When I saw the street car the second time, I was about ten or twelve feet from the track. The street car then seemed to be seventy or seventy-five feet from me. Seemed like it was going about the same speed. I kept on. I paid no further attention to the street car after I saw it the second time. The next thing I knew was when we were hit. Just before I saw the street car the second time, I figured we were traveling about two or three miles per hour. I continued at the same speed until I got onto the track, and then put it in high. The speed (of the automobile) increased while in high."

Cross-examination: "The 'hazard-stop' sign is located on the southwest corner of Broadway and Eichelberger Avenue—back a little ways from the corner of the curb, west of Broadway. It was between the curbing on Broadway and the footwalk, on the east side of the walk, as you walk down Broadway; that was the place where my husband's automobile was brought to a stop—just a little west of that 'hazard' sign—about ten feet, or something like that, all told, from the Broadway curb. The automobile was brought to a stop with reference to the curb about ten feet from the curbing—that was the only stop that I made up to that time. Up to the time I made the stop, I had not seen the street car, but I saw it then about three-quarters of a block away, and then I started to go on across. I drove, I judge, about eleven or twelve feet—no, I was about eight or nine feet away from the Broadway track when I noticed it (the street car) the second time. From the time I stopped until I saw the street car the second time, I drove about three or four feet—something like that. Q. And when you started up from that position, you saw that the street car was about three-quarters of a block away? A. When I made the stop for the 'hazard' sign, yes, sir, the street car appeared to be about three-quarters of a block away, and when I started up, it was down a little closer then. Q. You made only one stop there prior to the collision, and that was when you were about ten feet west of the curb-line on the west side of Broadway? A. About ten or twelve feet, something like that. When I started the machine in motion again, the street car was about seventy to seventy-five feet away. The space from the west rail of the southbound track to the curb-line on the west side of Broadway, I figure, is about six or seven feet. I paid no further attention to the street car after I saw it the second time. Q. When did you see it after that? A. After I saw the street car the second time I went right straight on across Broadway; I wanted to go on across the track; I never looked at it any more after that, after I looked at it the second time. It seemed to be about seventy or seventy-five feet away."

Harry Cramer, a police officer of St. Louis, testified on behalf of plaintiff: "I made a report of the accident which occurred on September 6, 1924, at Broadway and Eichelberger Avenue. When I

got there, I saw a Ford automobile lying on the west side of Broadway, about 25 feet south of Eichelberger Avenue, facing south. The street car was gone, and the fender on the left side of the automobile was mashed. The back fender and running board were down, partly down, and bent, and there was a dent in the left side. The left front fender was badly mashed up, and the left rear fender was mashed up—not entirely smashed—bent in. Broadway and Eichelberger Avenue are both open and public streets and highways in this city. It is not a congested district."

Sherwood Kubisch, a witness for plaintiff, testified: "I noticed a Ford touring car approaching Broadway on Eichelberger Avenue. It was coming east, this automobile was. I also noticed a southbound Broadway street car about a half block from the intersection of Eichelberger Avenue and Broadway. It attracted my attention for the reason that I didn't know whether this lady was going to come across Broadway and go north, or south, so I pulled more or less into the curb, and slowed down, so as to give her clearance if she did come into Broadway, because I didn't care to collide with her myself; but she came up and nearly stopped at that 'slow' sign on Eichelberger Avenue, as she approached Broadway at the intersection, and I also saw the street car coming down, which was running, I judge, at the rate of anywhere from 20 to 27 miles an hour, and this lady looked both ways. I saw her do that, and I continued to move, and by the time she started across Broadway I was just about parallel with Eichelberger Avenue, going north, facing Eichelberger Avenue, and this street car continued to come down, it looked to me, I judged it to be at about the same speed. The lady came across the street car track very slowly, well, about six or seven miles an hour, and just as the front wheels (of the automobile) were entering the west rail of the southbound track, the street car was, I judge, about from 15 to 20 feet north of where her car was crossing the rails, and just as her front wheels struck the east rail of the southbound track, the street car collided with the center of the left side of the automobile the lady was driving, and dragged it, I would say, approximately ten or twelve feet the other side, the full length of the car, beyond the intersection."

Cross-examination: "The front wheels of the automobile were just about to enter the west rail of the southbound track, and the street car was then about fifteen feet away, going at the rate of 20 to 25 miles per hour. There was some slackening of the speed to 23 miles per hour. The greatest speed the automobile attained was never more than eight to ten miles per hour, and at the time it was going on the track it was about eight to ten miles per hour. Going three miles per hour, under the conditions present there, the Ford auto-

mobile could have been stopped in at least three feet; at seven or eight miles per hour, in five feet, making an emergency stop.''

Kenneth Blackburn, a witness for plaintiff, testified: ''I was coming down Eichelberger Avenue about 150 feet in back of the Ford touring automobile, and the Ford automobile made a stop for Broadway; and the Ford started across the street at a slow rate of speed, and we were up to the corner by that time, and we came to a stop, pulled up pretty close to the corner, and I looked both ways, and I saw the street car north on Broadway; I would say it was about 50 or 60 feet north on Broadway, and this Ford touring automobile started across Broadway at a slow rate of speed. This street car was coming, I judge, about 25 miles an hour, or a little over, when the Ford got within, looked like it had one front wheel over the west rail of the southbound track, when the street car was on it and hit it. When the front wheels of the Ford had reached the west rail of the southbound track, the street car was about 25 or 30 feet away from the Ford touring automobile. The street car was then going twenty-five, or a little over, miles per hour. It increased its speed, if anything. The front wheels of the automobile were on the east rail when it was struck.'' Cross-examination: ''When the automobile first went upon the track, that is, the west rail, the street car was about thirty-five feet from the automobile, going twenty-five miles per hour or better, and the automobile was then going two or three miles per hour. The automobile could have been stopped easily within a foot. The street car did not slow up anytime prior to the collision. It increased its speed. After the collision, the back end of the street car was even with the curb-line on the south side of Eichelberger Avenue.''

Plaintiff proffered in evidence the ''Vigilant Watch Ordinance'' of the city of St. Louis, which provides: ''The motorman or any person in charge of said street car shall keep a vigilant watch for all vehicles and persons on foot, either on the track or moving towards it, and on the first appearance of danger to said persons or vehicles, the car shall be stopped in the shortest time and space possible.''

Mark Perry, defendant's motorman, testified:

''As I approached Eichelberger Avenue, I saw the automobile in which plaintiff and his wife were riding. When I first saw it, it was about fifty feet from Broadway, coming along slowly. I was then about seventy-five feet north of Eichelberger Avenue. The automobile then came up there and stopped right there for the 'hazard' sign; stopped dead still, and after it stopped dead still, it started; when it stopped still, I was still north of Eichelberger Avenue, and when I saw her stop, I put on about five points, and then she started up after that. When she started up the second time, I was just

about fifteen or twenty feet from Eichelberger Avenue, at the regular crossing, and she just gave it (the automobile) the gas and ran right out and got the left front wheel right against the west rail on Broadway; she was so close she just turned the wheels a little bit, and then threw up her hands and hollered. She turned the wheels to the south—the way I was going, and the fender of my car got in behind the front wheel of the automobile; I had my car in reverse and shoved her automobile about fifteen feet. When I saw her start towards the track, I gave the rails sand and applied the air. The purpose of the sand is to help make an emergency stop. When I saw that didn't do any good, I pulled the reverse, and by that time the fender was against her front wheel. As I approached Eichelberger Avenue, I was running about ten to twelve miles per hour, while I was coasting, and then I fed it up, I believe, to about five points, when I saw this automobile come to a dead stop.''

Cross-examination: ''I was driving about ten or twelve miles per hour all the way from Nebraska Avenue to Eichelberger Avenue; that distance is about three blocks. There are only two or three houses on that whole stretch there. There are dumps along there. I began ringing the gong when I left Nebraska Avenue. Between Nebraska and Eichelberger Avenues, I ring this gong continuously, because Eichelberger Avenue is a bad crossing. Machines come out on Broadway there from the west; some of them stop, and some don't. There have been accidents on Eichelberger Avenue there before. Brakes on the street car were in good condition, and it was a nice, sunny day, with the rails dry. With safety to the people on the street car, it would take about fifteen feet to stop the car, at ten or twelve miles per hour. The automobile was about two feet from the south curb-line of Eichelberger Avenue as it came into Broadway; that would put the left side of the automobile about seven feet north of the south curb-line of Eichelberger Avenue; that would place me about thirty-three feet away from the point of collision, at the time she started up the second time, and she traveled this fifteen feet while I traveled the thirty-three feet. I don't know whether she was looking at me or not. When she started up, I was about thirty-three feet away. At the time I saw her start up, I didn't know whether she was going to cross the track. She could have gone south. I didn't know which way she would go. At the time she started up, I was still thirty-three feet away from the collision, and at that time, by using the reverse, I could have stopped in fifteen feet. I pushed the automobile about fifteen feet after I hit it, so that I traveled this thirty-three feet and pushed the automobile fifteen feet, in all traveling the distance of forty-eight feet, and at any time could have stopped in fifteen feet.''

Re-direct examination: ''Q. In stopping in this fifteen feet by using the reverse, do you mean after the reverse takes effect? A. Yes,

sir. Q. What did you mean about stopping in fifteen feet if you used the reverse? A. That is, using the reverse and the power at the same time. Q. Before the reverse takes effect, I believe you testified, if I recall correctly, you first apply the sand and air? A. Yes, sir. Q. After that, you shut off the power? A. Yes, sir. Q. Then you set the reverse? A. Yes, sir. Q. And then apply the power? A. Yes, sir. Q. And during all that time your car naturally is still rolling on? A. Yes, sir. Q. I will ask you if you could have brought your car to any quicker stop than you did after you saw this machine (automobile) start up and come towards your track? A. No, sir."

Mrs. Baer, a passenger on the street car, testified for defendant: "I saw the lady and man coming east on Eichelberger Avenue, prior to the collision. I thought she was going to stop. She did slow down to almost a stop, and then she started up again and ran right across the track there. The street car was right about at Eichelberger Avenue, there where the stop is, when she started up again. The gong was sounded as the street car was approaching Eichelberger Avenue. When I saw her start towards the street car, I know he (the motorman) tried to stop the street car, because I was almost thrown out of my seat by the jar when he put on the brakes. I estimate the speed of the street car, as it was coming down there, at ten or fifteen miles per hour. I am not a good judge of speed. The front wheels (of the automobile) were just about next to the track, or maybe a little over, when the collision occurred. The front wheel was in the center of the track, between the two rails. The automobile was just about a foot or so from the street car when the front wheels were between the rails of the track."

Homer Horne, a passenger on the street car, testified: "I was in back of the motorman, holding onto that bar on the front end of the car. I noticed the motorman sounding his gong and trying to stop the car, and I looked out and saw a Ford automobile coming towards the track, and I knew they were going to crash. At the time I saw the automobile approaching, the street car was about ten feet away from the Ford. The street car was going slowly."

Joseph Granda, a passenger on the street car, testified: "I was on what they call the 'sand box,' facing the rear of the car. I saw the automobile about four feet before we hit it. The machine at that time was somewhere on the street car track. It was moving, and the street car was then within about four feet of it. Prior to that time, I noticed the frantic movements of the motorman, followed by the slackening of the speed of the street car. I hadn't seen the automobile up to the time the street car was about four feet of it. The street car ran about six or ten feet after the collision. The left front wheel of the automobile was a fraction of the way past the right rail

going south, that is, the west rail. The front part of the street car was already past the southern curb, just a little, about six or eight or ten feet. The front end of the street car was about nine and a half feet past the south curb-line of Eichelberger Avenue after the impact. At the time of the impact, the street car was three or four feet north of the south curb-line of Eichelberger Avenue. I don't know, but I suppose the front end of the street car was practically even with the south line of Eichelberger Avenue at the time of the impact.''

At the close of all the evidence, defendant requested the giving of a peremptory instruction, in the nature of a demurrer to the evidence, which request was denied by the trial court. Thereupon defendant requested the trial court to give seven instructions, each of which was designed to withdraw from the consideration of the jury one of the seven assignments or specifications of defendant's negligence, as charged in the petition, including the assignment that defendant was negligent in violating the ''Vigilant Watch Ordinance'' of the city of St. Louis, each and all of which withdrawal instructions were refused by the trial court. The cause was submitted to the jury, under instructions given at the request of plaintiff, wherein a verdict and finding for plaintiff were predicated upon defendant's negligence in violating the.''Vigilant Watch Ordinance'' of the city of St. Louis, and upon defendant's negligence under the humanitarian, or last-chance, doctrine, as applied by the judiciary of this State. Error is assigned by the plaintiff-appellant in the action of the trial court in giving, at the request of defendant, two instructions which submitted to the jury the defendant's theory of defense.

I. Appellant assigns error in the giving of defendant's Instruction No. 4, which reads:

''The court instructs the jury that if you find and believe from the evidence that plaintiff's wife drove from a position of safety, upon  the street car track at the time and place mentioned in the evidence immediately in front of or in close and dangerous proximity to an approaching street car thereon at a time when the motorman operating the street car could not with the means and appliances at hand, consistent with the safety of passengers, stop said car, or slacken the speed of the same, and avoid a collision with the automobile aforesaid after he saw, or by keeping a vigilant watch, would have seen that the automobile in which plaintiff was riding was going to enter a position of danger, then plaintiff is not entitled to recover and your verdict should be in favor of the defendant.''

Appellant urges that said instruction assumes the existence of facts not in evidence; that it "unduly directed the jury's attention to the supposition that the automobile was driven from a position of safety immediately in front of an approaching street car;" that there was no evidence to support the instruction; and that it substituted the judgment of the motorman in charge of the operation of the street car for the judgment of the jury as to when the automobile in which plaintiff was riding was entering a position of danger. In support of his criticism of the foregoing instruction, the appellant cites Althage v. People's Motorbus Co. (Mo.), 8 S. W. (2d) 924; Lewis v. Public Service Co. (K. C. C. A.), 17 S. W. (2d) 359; Nabe v. Schnellman (St. L. C. A.), 254 S. W. 731; and Goodwin v. Eugas (Mo.), 236 S. W. 50. An analysis of the cases, supra, cited by appellant, discloses that the instructions therein criticised, and held to constitute reversible error, were wholly and substantially different, in form, language, and legal effect, from defendant's given Instruction No. 4 herein. Furthermore, the controlling facts and circumstances in evidence in the cited cases were obviously different from the controlling facts and circumstances in evidence in the instant case, and the instructions which were criticised in the cited cases hypothesized certain facts and circumstances which were at variance with the evidence, and were not supported by the evidence, adduced therein.

Defendant's Instruction No. 4 does not assume the existence of any of the facts hypothesized therein, but, by the initial clause thereof, plainly required the jury to find the existence of such facts in arriving at a verdict. [O'Leary v. Steel Co., 303 Mo. 363, 385; Ward v. Railway Co., 311 Mo. 92, 106; Brown v. Railway Co., 315 Mo. 409, 421.] We think there is ample and substantial evidence in the record before us to support, and to warrant the submission of, the fact, hypothesized in the criticised instruction, that plaintiff's wife drove the automobile, "from a position of safety, upon the street car track . . . immediately in front of, or in close and dangerous proximity to, an approaching street car." Plaintiff, himself, testified that, when the front wheels of the automobile got to the nearest, or west, rail of the southbound street car track, the street car was "right at us;" and plaintiff's wife, who was the operator of the automobile, testified that, when the automobile was about ten or twelve feet west of the southbound street car track, she looked a second time at the approaching street car, and the street car then "seemed to be seventy or seventy-five feet from me." Plaintiff's witness Kubisch testified that, when the front wheels of the automobile "were just about to enter the west rail of the southbound track, the street car was then about fifteen feet away." Kenneth Blackburn, another witness for plaintiff, testified that "when the front

wheels of the Ford (automobile) had reached the west rail of the southbound track, the street car was about 25 or 30 feet away from the Ford automobile." The police officer, Cramer, testified, on plaintiff's behalf, to the effect that "the left *front* fender (of the automobile) was *badly mashed up,* and the left rear fender was mashed up—not entirely smashed—bent in." From the condition of the automobile after the collision, as described in police officer Cramer's testimony, the inference is reasonably and logically deducible that the left *front* fender of the automobile bore the brunt of the impact of the collision, indicating that the front wheels of the automobile had just entered upon, or were crossing, the west rail of the southbound street car track, immediately in front of the approaching street car, or at least in dangerous proximity thereto, when the collision occurred. A passenger on the street car testified that "the front wheels (of the automobile) were just about next to the track, or maybe a little over, when the collision occurred," and "the automobile was just about a foot or so (distant) from the street car when the front wheels (of the automobile) were between the rails of the track." Another passenger testified that "the left front wheel of the automobile was a fraction of the way past the right, or *west,* rail" of the street car track when the collision occurred. Plaintiff testified that, when the street car came to a stop, after the collision, "the street car and the machine (automobile) were coupled together, and the right (west) corner of the front end of the street car was fastened into the left side of the Ford automobile," thereby indicating that the impact of the collision was occasioned by the automobile being struck by the right, or west, corner of the front end of the street car, rather than by the center, or by the left (east) corner, of the forward end of the street car. The foregoing facts and circumstances, as related on the trial by the various witnesses, we think constituted sufficient and substantial evidence to warrant and support the submission of the hypothesis that plaintiff's wife drove the automobile, "from a position of safety, upon the street car track . . . immediately in front of, or in close and dangerous proximity to, an approaching street car thereon."

Likewise, we think that there was ample and substantial evidence to warrant and support the submission of the hypothesis that the plaintiff's wife drove the automobile upon the street car track "at a time when the motorman operating the street car could not, with the means and appliances at hand, consistent with the safety of the passengers, stop said car, or slacken the speed of the same, and avoid a collision with the automobile, after he saw, or by keeping a vigilant watch, would have seen that the automobile in which plaintiff was riding was going to enter a position of danger." It is true, as is argued by appellant, that the motorman of the street car stated,

upon cross-examination by plaintiff, that "I was still thirty-three feet away from the collision, and at that time, by using the reverse, I could have stopped (the street car) in fifteen feet." But, on re-direct examination, the motorman was asked what he meant "about stopping in fifteen feet" if he used the reverse, and the motorman explained his previous answer, given upon cross-examination, by stating that, before the reverse *takes effect,* sand must be applied to the rails of the car track, and the air-brakes must be applied to the car wheels, after which the electrical power or current must be shut off, the machinery of the car set in reverse, and the electrical power again applied, during which several and successive processes the street car is still "rolling," or moving forward. The defendant's motorman testified that, upon observing the automobile start to-wards the track, after the automobile had previously stopped at the "hazard" sign in Eichelberger Avenue, distant some ten or twelve feet west of the west curb-line of Broadway, he "gave the rails the sand and applied the air (brakes)," in order to make an emergency stop, after which he "pulled the reverse, and *by that time* the fender (of the street car) was against the front wheel" of the auto-mobile. Neither can we say that the instruction "unduly directs the jury's attention to the supposition that the automobile was driven, from a position of safety, upon the street car track immediately in front of an approaching street car." We do not view the instruc-tion as being in the nature of a commentary upon the evidence. As we have heretofore said, the instruction does not assume the existence of the hypothesized facts, but, by its initial clause, specifically re-quires the jury to *"find and believe"* the existence of such hypo-thesized facts. Nor do we find the instruction to be erroneous be-cause (to quote from appellant's criticism thereof) "it permits the motorman to be the judge as to when the automobile in which plain-tiff was riding was entering a position of danger." The instruction specifically required the jury to find and believe from all the evi-dence that the automobile was driven upon the street car track im-mediately in front of, or in close and dangerous proximity to, the approaching street car at a time when the motorman could not, with the means and appliances at hand, consistent with the safety of the passengers upon the street car, stop said street car, or slacken the speed thereof, and thereby avoid a collision with the automobile, after the motorman saw, *or by keeping a vigilant watch would have seen,* that the automobile *was going to enter a position of danger.* If plain-tiff-appellant had deemed it necessary or advisable that the jury should be advised as to the meaning and definition of the term "posi-tion of danger," as used in the defendant's instruction, he should have requested the giving of a special instruction defining that term. [38 Cyc. 1686, 1689; Thompson v. City of Lamar (Mo. Sup.), 17

S. W. (2d) 960, 973; Quirk v. Elevator Co., 126 Mo. 279, 293; Rattan v. Electric Railway Co., 120 Mo. App. 270, 280.] Having failed to ask for the giving of a special and definitive instruction, plaintiff will not be heard on appeal to complain of the failure of the court to define the term "position of danger."

Appellant furthermore urges that defendant's Instruction No. 4 is in conflict with plaintiff's Instruction No. 1, which submitted to the jury the plaintiff's theory of recovery under the humanitarian rule or doctrine of negligence, and which, in substance and effect, authorized a verdict for plaintiff if the jury should find that "plaintiff and said automobile then and there became and were in peril of being collided with by said street car, and that plaintiff was unable to extricate himself from said peril, and that defendant's servant in charge of and operating said street car, and controlling its movements, saw, or by the exercise of ordinary care would have seen, said automobile with plaintiff therein, in said situation of imminent peril, in time for defendant's said servant thereafter, by the exercise of ordinary care with the means and appliances then at hand, and with reasonable safety to said street car and the persons therein, to have stopped said street car or slackened the speed thereof, and thus and thereby avoided collision with said automobile."

Appellant cites our ruling in Shumate v. Wells, 9 S. W. (2d) 632, 634, 635, as condemnatory of the defendant's Instruction No. 4 in the instant case. In the Shumate case, supra, we condemned an instruction (as constituting reversible error) which authorized a verdict (for the defendant in that cause) if the jury should find "that the automobile in which the plaintiff was riding was driven directly in front of or in such close and dangerous proximity to the approaching street cars of the defendant . . . that said defendant's motormen, in charge thereof, could not by the exercise of ordinary care on their part have stopped or checked the speed of said street cars in time to have avoided the collision between said street cars and the automobile in which plaintiff was riding." In condemning such instruction, as given for defendant in the Shumate case, we said: "According to Instruction No. 5, the motorman was not required to make any effort to stop his car or check its speed until the automobile was driven directly in front of or in close and dangerous proximity to it, whereas it was the motorman's duty to act as soon as it became apparent, from the movements of the automobile, that the driver intended to cross the track ahead of the car." Defendant's Instruction No. 4 in the instant case, unlike the instruction condemned in the Shumate case, supra, in effect told the jury that it was the duty of defendant's motorman to stop the street car, or slacken its speed, after the motorman "saw, or *by keeping a vigilant watch* would have seen, that the automobile in which plaintiff was riding *was going to*

*enter a position of danger.''* We view the language and direction of the instruction as tantamount to telling the jury that it was the duty of the defendant's motorman to act as soon as it became apparent, by keeping a vigilant watch, that the driver of the automobile intended to cross the track ahead of the street car, and, in so doing, enter a position of danger. Thus, the instruction herein supplies and contains the essential element which was lacking in the instruction condemned in the Shumate case. We find no conflict between defendant's Instruction No. 4 and plaintiff's Instruction No. 1, submitting to the jury the charge and assignment of defendant's negligence under the humanitarian doctrine. Appellant's assignment of error in the giving of defendant's Instruction No. 4 must be denied.

II. Appellant assigns error in the giving of defendant's Instruction No. 3, which reads:

"The court instructs the jury that a motorman, while operating his car at a prudent and lawful rate of speed, upon seeing a vehicle  in a position of safety and not in any danger of a collision with his street car, is entitled to assume that such vehicle will remain in that position of safety and outside of the danger zone, and is under no duty to commence to stop or slacken the speed of his car until he sees, or in the exercise of ordinary care by keeping a vigilant watch would see, that such vehicle was going to enter a position of danger. In this connection the court further instructs you that if you find and believe from the evidence that the motorman operating the street car in question was operating the same at a prudent and lawful rate of speed and that as soon as it was apparent to such motorman, or would have been apparent to a reasonably prudent and careful motorman under similar circumstances by keeping a vigilant watch, that the automobile in which plaintiff was riding was going to enter a position of danger, it was then too late for such motorman, in the exercise of ordinary care, with the means and appliances at hand, consistent with the safety of passengers on the street car, to stop or slacken the speed of the same in time to avoid a collision, then plaintiff is not entitled to recover and your verdict should be in favor of the defendant."

Appellant claims that the instruction is a commentary upon the evidence; but, in his brief and argument herein, the appellant does not make clear to us wherein the instruction well can be said to constitute a comment upon the evidence. If appellant's criticism has reference to the first sentence of the instruction, upon the theory that

the first sentence merely states an abstract principle or proposition of law, we deem it a sufficient and complete answer to appellant's criticism to say that the proposition or principle of law, as stated in the first sentence of the instruction, is thereafter concretely applied to the hypothesized facts in the second, or concluding, sentence of the instruction. [Fowlkes v. Fleming (Mo. Sup.), 17 S. W. (2d) 511, 516.] And if appellant means to claim that the first sentence of the instruction states the general rule or principle of law too broadly (respecting the correctness and merit of which criticism we are not attempting to rule), nevertheless, we think that the subsequent sentence of the instruction explains, qualifies and renders harmless any improper, or too broad, statement of the general principle of law, as announced in the first or introductory sentence of the instruction. [Garard v. Coal & Coke Co., 207 Mo. 242, 260; Bradley v. Railway Co., 138 Mo. 293, 308; Hutson v. Stair Co. (Mo. App.), 296 S. W. 216, 218.] We do not view the instruction as amounting to an improper comment upon the evidence, or as giving undue prominence to the facts and circumstances hypothesized therein. [Ward v. Railway Co., 311 Mo. 92, 106; Irons v. American Ry. Express Co. (Mo. Sup.), 300 S. W. 283, 288.] Nor do we find that the instruction ''assumes, and unduly directs the jury's attention to the supposition, that the plaintiff's automobile was in a position of safety when the motorman's duty to stop, or to slacken the speed of, the street car began,'' as is urged and contended by appellant.

It is furthermore claimed by appellant that defendant's Instruction No. 3 is an erroneous statement or declaration of the law, and is in conflict with plaintiff's Instruction No. 2, which submitted plaintiff's theory of defendant's negligence in violating the ''Vigilant Watch Ordinance'' of the city of St. Louis. Appellant urges that defendant's Instruction No. 3 prescribes a lesser degree of care to be exercised by defendant's motorman than is required of the motorman by the provisions and requirements of the ''Vigilant Watch Ordinance,'' as such ordinance has been construed and applied by this court, en banc, in State ex rel. Vogt v. Reynolds, 295 Mo. 375, and as subsequently applied by this court in the later cases of Grossman v. Wells, 314 Mo. 158, 171, and Heigold v. United Railways Co., 308 Mo. 142, 150. It is insisted by appellant that defendant's given Instruction No. 3 is predicated upon the erroneous theory that the duty imposed upon the motorman of the defendant's street car by the ''Vigilant Watch Ordinance'' of the city of St. Louis is to exercise only *ordinary* care, whereas such ordinance, as construed and applied by our court in the cited cases, supra, imposes a higher degree of care than is required of a motorman under the rules of the common law, and that, in sparsely settled or inhabited sections of the city

(where the collision here in question seemingly occurred), the ordinance requires the exercise of more than the ordinary care sufficient under the rules of the common law. The respondent, on the other hand, strenuously contends that the criticised instruction "properly reckons with the duty of the motorman to keep a vigilant watch, as required by the ordinance," and, while in the initial sentence of the instruction the term "in the exercise of ordinary care" appears, such term is immediately followed and qualified by the words "by keeping a vigilant watch." Hence, respondent argues that the clause "in the exercise of ordinary care, by keeping a vigilant watch," can mean nothing more or less than "by keeping a vigilant watch," as the latter term is prescribed and defined by the ordinance, and as construed and applied by this court in the cited cases, supra; wherefore, respondent insists that the defendant's given Instruction No. 3 properly states and declares the principle of law applicable to the submission of defendant's alleged negligence in the violation of the "Vigilant Watch Ordinance" of St. Louis, and in no wise contravenes the rulings of our court as announced in the several cases, supra, cited and relied upon by appellant. However, without ruling or deciding the question whether defendant's Instruction No. 3 is erroneous as misstating and improperly declaring the principle of law applicable to the submission of defendant's alleged negligence under the "Vigilant Watch Ordinance" of St. Louis, and assuming, *arguendo,* that said instruction improperly declares and states the applicable principle of law, and that said instruction is in conflict with plaintiff's given Instruction No. 2, submitting the cause under the "Vigilant Watch Ordinance," yet we are constrained to hold that the giving of defendant's Instruction No. 3 was not reversible or prejudicial error. This, for the reason that, under the facts and circumstances in evidence herein, plaintiff must be held to have been guilty of contributory negligence as a matter of law, barring a recovery under any charge or theory of primary or "ordinance" negligence (i. e., negligence bottomed upon the violation of an ordinance) upon the part of defendant and his motorman in charge of the operation of the street car. It has been uniformly and consistently ruled by this court that "contributory negligence is a good defense against statutory or ordinance negligence," and, where plaintiff seeks to submit his case under the "Vigilant Watch Ordinance," if he has been contributorily negligent as a matter of law, such contributory negligence will bar a submission and recovery under the charge or assignment of defendant's primary negligence in violating the "Vigilant Watch Ordinance." [Gubernick v. United Railways Co. (Mo.), 217 S. W. 33, 35; Heigold v. United Railways Co., 308 Mo. 142, 151; Grossman v. Wells, 314 Mo. 158, 171.]

The evidence herein is uncontroverted that plaintiff was the owner of the Ford automobile which plaintiff's wife was driving and operating at the time of the collision between the automobile and defendant's street car. It also conclusively appears from the plaintiff's evidence that plaintiff and his wife were returning to their home after a visit with plaintiff's mother-in-law; in other words, plaintiff and his wife were engaged at the time of the collision in a joint trip or enterprise. Plaintiff and his wife were seated in the front seat of the automobile, and both had equal opportunity to see and observe the approaching street car, before entering upon the west rail of the southbound street car track. In truth, plaintiff and his wife testified quite positively that they both saw the approaching street car at the time when the automobile was brought to a stop at or about the "hazard" sign in Eichelberger Avenue, a distance of 10 to 15 feet from the west curb-line of Broadway, and that they both again saw and observed the street car approaching, with undiminished (and, perhaps, at higher and increased) speed, and distant only 70 to 175 feet, when the automobile was about six to twelve feet from the west rail of the street car track. According to the testimony of plaintiff's wife, the automobile was then moving forward, in low gear, at a speed of two or three miles per hour, and according to plaintiff's testimony, the automobile was then traveling at a speed of eight or ten miles per hour. Neither plaintiff nor his wife looked again toward the approaching street car until the collision occurred. There was substantial evidence from plaintiff's witnesses that the automobile could have been stopped within three to five feet, and one of plaintiff's witnesses testified that the automobile "could have been stopped easily within a foot." Under the facts and circumstances in evidence, as related by plaintiff and his own witnesses, it seems obvious to our minds that plaintiff and his wife were "flirting with death," or, to say the least, they were courting bodily injuries.

It is the preponderance of juristic authority that the negligence of the driver of an automobile is not ordinarily imputable to a mere guest, or to a passenger who is riding in the automobile, but who has no authority or control, either over the automobile, or over the driver thereof. But it is likewise the preponderance of juristic authority that the negligence of the driver of an automobile is imputable and attributable to the owner of the automobile, especially where (as in the instant case) the owner is personally present in the automobile, and where the owner and the driver of the automobile are engaged in a joint journey or enterprise, either of business or pleasure. Such is the prevailing rule in our own State and jurisdiction. [Tannehill v. Railway Co., 279 Mo. 158, 171; Dauber v.

Josephson, 209 Mo. App. 531, 539; McKerall v. Railway Co. (Mo. App.), 257 S. W. 166, 170; Perrin v. Wells (Mo. App.), 22 S. W. (2d) 863, 865.] And such is the prevailing rule in other and foreign jurisdictions. [Lucey v. Allen, 44 R. I. 379, 382; Zandras v. Moffett, 286 Pa. 477, 482; Schofield v. Director General of Railroads, 276 Pa. St. 508, 510; Bullard v. Elevated Ry. Co., 226 Mass. 262, 265; Gersman v. Railway Co. (Mo.), 229 S. W. 167, 170, applying the Kansas rule; 1 Berry on Automobiles (6 Ed.) sec. 642, pp. 511, 512, and cases there cited.] The theory of the aforestated and prevailing rule of imputable negligence is that the relation of principal and agent, or of master and servant, exists between the owner and the driver of the automobile, and that the owner, being personally present in the automobile at the time, and having the control and authority of a principal or master, is responsible for, and bound by, the negligence of his agent or servant.

We find the evidence herein is such as to convict both plaintiff and his wife of contributory negligence as a matter of law. [Sullivan v. Railroad Co., 317 Mo. 996, 1009; Evans v. Railroad Co., 289 Mo. 493, 501; Gubernick v. United Railways Co. (Mo.), 217 S. W. 33, 35; Gersman v. Railway Co. (Mo.), 229 S. W. 167, 170; Pienieng v. Wells (Mo.), 271 S. W. 62, 66; Chawkley v. Railway Co. (Mo.), 297 S. W. 20, 27.] Their contributory negligence was a complete defense and bar to a recovery by plaintiff under the charge or assignment of primary negligence that defendant's motorman had violated the "Vigilant Watch Ordinance" of the city of St. Louis, and hence the trial court should have given the peremptory instruction, as requested by defendant, withdrawing such charge or assignment of primary negligence from the consideration of the jury. Since plaintiff was not entitled to the giving of his Instruction No. 2, which submitted such charge or assignment of primary negligence to the jury, it follows that no reversible or prejudicial error can be predicated upon the giving of defendant's Instruction No. 3, even though it might be said that defendant's instruction erroneously declares the rule or principle of law applicable to the assignment of negligence respecting the defendant's alleged violation of the "Vigilant Watch Ordinance," and although defendant's instruction might be deemed to be in conflict with plaintiff's instruction, submitting such charge or assignment of primary negligence. [Moore v. Lindell Railway Co., 176 Mo. 528, 545; Quinn v. Street Railway Co., 218 Mo. 545, 561; Giles v. Railroad Co., 278 Mo. 350, 355.]

Our attention being directed to no reversible or prejudicial error herein, it follows that the judgment *nisi* must be affirmed. It is so ordered. *Ellison* and *Ferguson, CC.,* concur.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur.