**GALLAHER–SMITH–FEUTZ REALTY, INC., Appellant,**

v.

**CIRCLE Z FARM, INC., et al., Respondents.**

**No. KCD 27830.**

Missouri Court of Appeals, Kansas City District.

Dec. 27, 1976.

Edward D. Hodge, Jerome W. Seigfreid, Mexico, for appellant; Edwards, Seigfreid, Runge & Hodge, Inc., Mexico, of counsel.

Robert Hines, Richard C. Thomas, Columbia, for respondents; Bear, Hines & Thomas, Columbia, of counsel.

Before DIXON, P. J., PRITCHARD, C. J., and WASSERSTROM, J.

PRITCHARD, Chief Judge.

This is an action to recover a 5% commission for the sale of 913 acres of land, based upon an alleged exclusive sales contract as

per Count II of appellant's petition, as submitted to the jury in Instruction No. 4 against respondent, Robert W. Schulze. One issue is whether Instruction No. 5 properly hypothesized Schulze's defense that Feutz, acting for appellant, knew that there was a better offer for the property, which he failed to communicate to Schulze, before he had procured a buyer who was ready, willing and able to purchase the property on the terms of the seller, Schulze.

The facts tending to support Schulze's theory, which he was entitled to submit to the jury if *his* evidence justified it [*Martin v. Effrein*, 359 Mo. 1150, 225 S.W.2d 775, 777[1] (1949); *Robertson v. Grotheer*, 521 S.W.2d 452, 457 (Mo.App.1975)] are these: On January 15, 1974, Schulze signed an exclusive listing agreement with appellant realtor for two months ending March 15, 1974, "and thereafter until terminated by me upon sixty days prior notice in writing." The 913 acres had been conveyed to respondent corporation which was owned by Schulze, his wife, and his son. Feutz advertised the farm in newspapers and magazines, and before securing a purchaser he invited Maxine Blackmore of Blackmore Realty to contact him if she had a party interested in purchasing the farm. The original listing price was $1,000 per acre, but, according to Feutz, the price was reduced to $800 an acre for unirrigated land and $1,000 an acre for irrigated land some 30 to 40 days after the listing. An offer of one Pilla to buy the farm for $800 an acre did not culminate in a contract, after which Henry Finck told Feutz he would buy the farm at that price. Feutz, on March 13, 1974, wrote Schulze and advised him, "Also, Henry Finck who wanted to rent the farm from Mr. Pilla, has decided he would like to buy it, is willing to give the price, if we could work out the financing for him. I think we can do this as he owns around 700 acres of good land southwest of Mexico." Feutz, Finck and Schulze met on March 14, 1974, to discuss the sale at which meeting Finck said he wanted to take another look at the farm. The three met again on March 15, 1974, and Schulze informed Feutz and Finck that his attorney, Baker, had told

him that a greater tax advantage could be gotten by selling the stock of the corporation rather than the land itself (which would be conveyed by the corporation). Finck indicated that would be agreeable, and that evening Feutz brought Schulze Finck's check for $25,000 "earnest money", which check was made payable to Gallaher, Smith & Feutz, which check was endorsed "FOR DEPOSIT IN ESCROW ACCOUNT Circle 'Z' Ranch Inc. By (signed) Robert W. Schulze and (signed) Frances B. Schulze." Feutz testified that the check was never deposited, but it was held by appellant in its safe. Finck did not then have funds in his checking account to cover the check.

Sometime after March 15, 1974, Schulze's attorney prepared a contract of sale whereby Schulze and his wife were to sell the stock of Circle "Z" to Finck and his wife for $730,000. Finck took this proposed instrument to his attorney for review. Finck was not agreeable to the provision for prepayment of $35,000 on a first deed of trust note on the property, and he made notations on the back of the proposed contract, which Feutz requested Schulze's attorney to incorporate in a change, and substitute the last page, signed by Schulze and his wife which "would save Bob having to go to the trouble of getting her signature again." Apparently, Schulze and his wife were separated.

On April 5, 1974, Feutz and Finck presented to Schulze a proposed contract, signed by the Fincks, but which provided not for a sale of corporate stock but a sale of the farm by the corporation. Schulze said he was in favor of the contract and would try to get the corporation to approve it, but the next day, with all three shareholders and the board of directors present, it was voted two to one not to sell.

On the afternoon of March 15, 1974, Feutz showed Maxine Blackmore the $25,000 "earnest money" check from Finck and told her the farm was sold but that maybe her buyer could still get it. During all of the time after March 15 that negotiations were going on between Finck and the Schulzes, Feutz was negotiating a proposed

contract for Finck to sell the farm to Mrs. Blackmore's client, Jacqueline Behlman, for $836,000. Jacqueline subsequently bought the farm directly from Circle "Z" Ranch at the price. Mrs. Blackmore was to be paid a $40,000 commission, and she was paid one-half of it, and the other one-half was placed in escrow upon her refusal to pay Feutz a part of the commission.

About the third week in February, Mrs. Blackmore contacted Feutz to get more information about the farm, and told him she had a man interested in it. That man was Dennis Behlman who was conducting negotiations for his sister, Jacqueline. On March 14, 1974, Dennis called Mrs. Blackmore to see if the farm was still available. About 5:00 or 6:00 that evening, she called Feutz and told him that she had an interested buyer for the full $836,000 and that a check was being sent by Dennis which was expected to arrive that evening. The check was in Mrs. Blackmore's possession later that evening. The next day (March 15, 1974), she called Feutz at his home about 8:00 a.m., and told him she had a check and asked if she could meet him at Schulze's home to make a contract. Feutz told her "No", that he was meeting a man there at 10:00.

At no time between March 14, 1974, and April 6, 1974, did Feutz convey the Behlman offer of purchase for $836,000 to Schulze or other members of his family. Schulze first learned of the offer on April 6, 1974, from Dennis Behlman after Feutz had told Mrs. Blackmore that the farm was no longer for sale. Appellant, by its Count II of the petition, claimed a commission on the Behlman purchase on the theory that its exclusive sale contract continued to that subsequent sale.

Schulze's defense was tendered to the jury in Instruction No. 5:

"Your verdict must be for the defendant Robert Schulze if you believe:

First, plaintiff knew of the existence of an offer to purchase the real property mentioned in evidence for the sum of $836,000 at the time plaintiff was attempting to get defendant to enter into a contract with Henry Finck, and

Second, the offer of $836,000 was more than the offer of Henry Finck, and

Third, plaintiff failed to tell defendant of the $836,000 offer, and

Fourth, plaintiff's failure to tell defendant was material to the sale of the real property."

■ In its Point I, appellant contends that Instruction No. 5 erroneously failed to limit the time period in which it (through Feutz) was obligated to advise its client of an offer to purchase, thus giving the jury a roving commission, permitting speculation as to the issue. The contention is premised upon the further contention that there was established a valid *oral* contract of sale as of March *15,* 1974, because at *that* time every essential element of the contract had been agreed upon. It is argued that at no time during the trial was there any objection to evidence of the oral contract, and thus there was a waiver of the right of respondent to assert the defense of the Statute of Frauds. Appellant correctly says, citing *Heath v. Beck,* 231 S.W. 657, 659[5, 6] (Mo.App.1921); and *Miller v. Harper,* 63 Mo.App. 293, 296, 297 (1895), that because there was no objection to oral testimony, the statute of frauds was waived. See also *Barr v. Snyder,* 294 S.W.2d 4, 10[9–13] (Mo.1956). There is no necessity to consider further the contention of waiver of the defense of the statute of frauds, because as hereinafter developed, there was *never* any valid binding contract of sale, written or oral, between Finck and respondent. Appellant says further that March 15, 1974, was the critical date in determining when appellant's obligation to relay offers to respondent ceased. Under the evidence above set forth, it was not March 15, but March 14, 1974, when Feutz received the information from Mrs. Blackmore that she had a purchaser who would pay $836,000 for the farm. At that time, clearly, Finck and Schulze had come to no meeting of minds as to sale and purchase of the farm even orally. Finck was not then a willing purchaser—he wanted to take an-

other look at the farm. Although the law is that a broker is entitled to a commission when the negotiations which he is authorized to make are concluded or are conducted to a stage where as to all material matters or essential terms there is a meeting of the minds between the principal and the purchaser produced by the customer [12 C.J.S. Brokers § 84, p. 184], the negotiations had not been concluded when Feutz received information of the better offer on March 14, 1974. For further authority as to a broker's fulfillment of his contract with a seller in producing a ready, willing and able purchaser, see 12 C.J.S. Brokers § 85, p. 189; *Tant v. Gee*, 348 Mo. 633, 154 S.W.2d 745, 747[2] (1941); *Kyle v. Kansas City Life Ins. Co.*, 356 Mo. 331, 201 S.W.2d 912, 913[1] (1947); and also *Dolan v. Ramacciotti*, 462 S.W.2d 812, 815[2–5] (Mo.banc 1970). Although somewhat less clearly, it is evident that negotiations beginning on March 15, 1974, which resulted in several preparations of a proposed written contract, never ripened into a binding contract, considering the evidence that Finck was not agreeable to the prepayment of $35,000 on the deed of trust note, and the sellers never did agree to a conveyance of land by the corporation rather than a sale of its corporate stock—which were certainly material matters to be resolved, and which under the evidence continued to be negotiated up to April 5, 1974, when all further negotiations ceased.

■ The rule of law requiring appellant to disclose facts within his knowledge which might materially affect his principal's action in making a sale is contained in 12 C.J.S. Brokers § 69, p. 160, where it is said, "To be entitled to a commission, a broker must disclose to his principal all facts within his knowledge which are material to the matter in which he is employed and which might influence the principal's action; and where he intentionally conceals, withholds, or fails to disclose such facts, he loses his right to compensation, * * *." See also, *Klein v. Terminal R. Ass'n of St. Louis*, 268 S.W. 660, 664[4–7] (Mo.App.1925); *King v. Pruitt*, 365 Mo. 823, 288 S.W.2d 923, 925[1, 2] (Mo.banc 1956); *Herb Tillman Co. v. Sissel*, 348 S.W.2d 819, 824[4–7] (Mo.App.

1961); *Sunset Acres Motel, Inc. v. Jacobs*, 336 S.W.2d 473, 482[12–16] (Mo.1960). More factually and specifically in point is the case of *Dittmeier v. Missouri Real Estate Commission*, 237 S.W.2d 201 (Mo.App. 1951), where defendant real estate broker induced his customer to sell realty for $3750, when he had already sold or contracted to sell it to a purchaser for $4,100, it being held, loc. cit. 237 S.W.2d 206[7–9], that the broker was under an absolute obligation to reveal that fact. It was held in *Dittmeier* that this failure to disclose justified the Missouri Real Estate Commission in suspending the license of the broker for six months. Here, not only was there a failure to disclose the fact of the better offer, but the evidence shows that during subsequent negotiations, Feutz was endeavoring to negotiate a further sale by Finck to Jacqueline from whom, through Mrs. Blackmore, the better offer had originally come. The jury was entitled to take this latter fact into consideration concerning Feutz's breach of his fiduciary obligation to Schulze.

■ In any event, the duty to disclose the Behlman better offer arose on March 14, 1974, and continued throughout all subsequent negotiations between Finck and Schulze. Feutz never did inform Schulze of the better offer. Instruction 5 was not erroneous in failing to limit the time in which appellant was obligated to advise its client more specifically than the time in which it was attempting to get respondent to enter into the Finck contract. The time from March 14, 1974, to April 5, 1974, is supported by the evidence of continued negotiation. Point I is overruled.

■ Instruction No. 5 is attacked in Point II because it failed to define the word "material". The *Dittmeier* case, supra, quoting Restatement of Agency, Section 390, Comment A, defined a fact as being material if it is one which the agent should realize would be likely to affect the judgment of the principal in giving his consent to the agent to enter into the particular transaction on the specified terms. Trans-

lated here, the definition means that the seller would not have considered the Finck contract at all if he had known of the offer of purchase in the greater amount. "Material" in that sense can be only a term of common usage and understanding. Compare *Moore v. McCutchen,* 190 S.W. 350, 352[9] (Mo.App.1916). Furthermore, if appellant believed the word should have been defined, it should have requested an instruction on it. *Smith v. Wells,* 326 Mo. 525, 31 S.W.2d 1014, 1022[6] (1930). Point II is overruled.

By Point III, appellant says that Instruction No. 5 related only to its (unsubmitted) Count I which was for the alleged original commission due on the $730,000 sale to Finck, and was erroneous because it raised a defense to Count II, which submitted appellant's recovery on the theory of its exclusive listing contract, when the property was finally sold to a third party while the listing was still in force. The *Dittmeier* case, supra, and others, supra, on the general duty to disclose material facts, apply also to a claimed exclusive listing contract. The compensation is lost in either type of contract, if there is a failure to disclose a fact, before production of a ready, willing and able purchaser, which would cause the seller not to enter into a contract. Point III is overruled.

Appellant contends by Point IV that Instruction No. 5 is erroneous because it failed to require a finding of bad faith on its part in not revealing the better offer to purchase to respondent. The cases and authority, supra, do not speak solely of bad faith and fraudulent conduct on the part of a broker which would cause a loss of compensation. The mere failure to disclose a better offer of purchase to the principal may be a basis for a finding of a breach of duty and thus a denial of compensation. 12 C.J.S. Brokers § 69, pp. 159, 160; 12 Am. Jur.2d, Brokers, §§ 89, 90, pp. 842, 843; Anno., 7 A.L.R.3d 693. Negligence in failing to disclose a better offer may also be a defense to an action for compensation. 12 C.J.S. Brokers § 73, p. 164; and Anno., 94 A.L.R.2d 468, 478, § 8. Point IV is overruled.

The judgment is affirmed.

All concur.