# OCTOBER, 1929.

JOE LA BELLA, ADMINISTRATOR, PETE LA BELLA, DECEASED, RESPONDENT, v. SOUTHWESTERN BELL TELEPHONE COMPANY, APPELLANT.

Kansas City Court of Appeals.   January 27, 1930.

*A. C. Popham, Frank Benanti* and *Julius C. Shapiro* for respondent.

*Henry S. Conrad, L. E. Durham* and *Hale Houts* for appellant.

ARNOLD, J.—This is an action in damages for the death of Pete La Bella, an unmarried minor, fifteen years of age. The suit was instituted by Joe La Bella, administrator of the estate of Pete La Bella, for the benefit of a brother and sister of the deceased, his sole surviving next of kin. The Southwestern Bell Telephone Company and Edward Hartig were joined as defendants.

The facts of record are as follows: Defendant Southwestern Bell Telephone Company is and was a corporation, duly organized and existing under the law; that defendant Edward Hartig was, at the time of the occurrence which is the basis of this action, and for a long time prior thereto, in the employ of the defendant corporation as a general foreman and, as such, was the overseer of other agents, servants and employees of the defendant corporation; and the petition alleges that he was ''in possession of, caring for, and a custodian and watcher over and of the property and effects of defendant'' at the place stated.

The deceased lived with his grandmother and his sister and brother; he was employed and turned his earnings over to his grandmother for the living expenses of the family. He was killed by a pistol shot in the head, the weapon having been fired by defendant Hartig on February 10, 1927, at which time Hartig was engaged with a crew of men in taking down old cables from the poles of the company's telephone lines along Guinnotte avenue in Kansas City, Missouri, at or near the intersection of Lydia avenue.

It appears of record that new cables had been installed and the old cable was being taken down, cut into sections and piled along the sidewalk to be removed to the telephone company's warehouse to be disposed of as junk. The shooting occurred about two o'clock P. M. on February 10, 1927. Guinnotte avenue runs east and west, and Lydia avenue intersects that street at right angles. On the north-

west corner of said intersection at that time was a soft drink parlor, wherein was a telephone. It appears that during working days it was the practice of Hartig to report to the telephone company at intervals, in order that his whereabouts might be known and necessary directions to work or change of work might be given him.

On the day of the tragedy and immediately prior to the same, Hartig had been using this telephone for the purpose indicated above. Hartig testified that while he was so using the telephone about two o'clock P. M., he happened to look out of the window and saw three boys picking up sections of cable across the street on the south side of Guinnotte avenue and the west side of Lydia avenue; that he hung up the receiver and started across the street for the purpose of stopping the boys from carrying away the cable which was composed of lead and copper wire, taking with him a revolver handed to him by the proprietor of the soft drink parlor with the suggestion that he take it along; that when he got out in the street the boys saw him and started to run with the cable; that he called to them to halt and started running after them; that he repeated the command to halt three or four times and finally fired the revolver; that he intended to shoot into the air to frighten the boys so they would stop and he could put them under arrest. The shot struck decedent in the back of the head and he fell in the street some seventy-five feet from the place where witness stated he saw the boys pick up the cable; that the boys had carried the cable only about fifty feet. The boy was taken in an ambulance to a hospital where he died in a few hours.

It further appears from the evidence that Hartig had no commission to carry firearms in Missouri; and Hartig testified that he carried none, but that he had such a commission in Kansas, where he lived.

There seems to be no dispute that the shot from the hand of Hartig killed decedent. It is also not disputed that decedent had none of the cable in his possession at the time he was shot. There is some testimony in defendant's behalf to the effect that decedent had some of the cable in his arms at the time Hartig commanded the boys to halt. On the contrary, there is evidence of record that decedent had not at any time immediately prior to the shooting had any of the cable in his possession, and that he and his two companions were not running when the shot was fired. Of course these were questions for the determination of the jury and which the jury did determine. There were witnesses who corroborated Hartig in part, and also other witnesses who offered opposing testimony.

The amended petition, upon which the cause was tried, makes the usual formal allegations and charges that defendant Hartig—

"Believing and supposing that the said Pete La Bella was guilty of stealing, purloining, taking, or about or threatening to steal, take and carry away, some of the property then and there situated and belonging to said defendant corporation, and while said defendant Hartig was in charge, possession, custody, and control of said property and effects of said defendant corporation, and while said Hartig was acting in the scope of his said employment as foreman, agent, servant and employee as aforesaid in the furtherance of and about the business of said defendant, and in the conserving, retention, and saving and holding of its said property, did without just cause or provocation therefor, unlawfully, wantonly, recklessly, wilfully and maliciously commit an assault upon the said Pete La Bella, and with a deadly weapon, to-wit, a revolver, discharge the same at and towards the said Pete La Bella injuring him and causing said bullet to pass through his head, which, as a direct result of such injuries received, caused the death of said Pete La Bella."

Judgment is asked in the sum of $10,000, as "actual and punitive exemplary damage."

The defendants filed separate answers in the form of general denials. Upon the pleadings thus made the cause was tried to the court and a jury, resulting in a verdict and judgment for plaintiff and against both defendants, in the sum of $5000. Motions for a new trial and in arrest of judgment duly filed were overruled and defendants have appealed.

Eleven assignments of error are presented which we will dispose of in the order in which they appear. First, it is urged the court erred in refusing to direct a verdict for both defendants at the close of all the evidence, as requested. Under subdivision (a) of this point, it is urged defendant telephone company was not responsible for the act of Hartig in firing the revolver, for the reason the act was not committed within the scope of his employment, and (b) under the pleadings and the evidence Hartig was not liable and therefore the defendant telephone company was not liable in any event, —that the shooting of the boy was not intentional.

The vital question presented in the two subdivisions of this charge of error is, "Was the shooting done within the scope of Hartig's employment?" Defendants state "for the sake of argument" that if Hartig had fired the shot while decedent was carrying the cable, and for the purpose of recovering same, then his act would have been within the scope of his employment, since a part of his duty was to watch and conserve the property of his employer. According to witnesses who testified, decedent, in fact, picked up and started away with the cable, dropped it before the shot was fired, and thereafter ran twenty-five feet or more. However, there was testimony in plaintiff's behalf that decedent never had been carrying any cable.

It is therefore undisputed that decedent was not carrying away any cable at the time of the shot and that he was empty-handed at that time. It is argued, therefore, that Hartig shot, not for the purpose of recovering the cable, but for the purpose of effecting an arrest, and that such arresting was no part of Hartig's duty, and was necessarily outside the scope of his employment.

It is urged a master is not responsible for all acts done by his servant during his employment, but only for acts done in furtherance of the employer's business. Citations are offered in support of this position which we think unnecessary because in support of an undisputed proposition of law. The arguments, from whatever direction, lead us back to the point requiring solution as to whether Hartig was acting within the scope of his employment; if so, he was liable, and under the rule of *respondeat superior*, his employer was also liable.

Defendant Hartig, called as a witness for plaintiff, testified he was acting as vice principal of the company in charge of various employees engaged in taking down cables to be removed to the warehouse of the company; that it was his duty to watch over, account for and preserve these old cables; that, at the time and place in question he was in exclusive authority over this property and responsible to the company for it. He stated that when he started after the boys it was "for the purpose of stopping them from getting away with the material;" "to save the company's property;" that he took the pistol which the proprietor of the soft drink parlor handed him "to help me out" and that he used it. He stated, "I intended to fire in the air with the intention of stopping them—frighten them to stop so that we might put them under arrest." He said he was running when he fired the shot.

The evidence in behalf of plaintiff is to the effect that decedent did not take or attempt to take or have in his possession any of the cables, but was taking a walk upon the street.

It is the law that the question of the master's liability may not always be determined by an analysis of the motive. The motive, of course, is important, but it is not so much for the purpose of determining how the act was done as to aid in deciding whose act it was. The tendency of modern decisions is to attach less importance to the motive with which the act was done, and to give more attention to the question as to whose business was being done, and whose general purposes were being promoted. [Maniaci v. Express Co., 266 Mo. 633, 182 S. W. 981; 2 Mechem on Agency (2 Ed.), secs. 1929, 1960.] In the cited case it is said, l. c. 647 (quoting from Rounds v. Railroad, 64 N. Y. l. c. 134):

"The master who puts the servant in a place of trust or responsibility, or commits to him the management of his business or

care of his property, is justly held responsible when the servant, through lack of judgment or discretion, or from infirmity of temper, or under the influence of passion aroused by the circumstances and the occasion, goes beyond the strict line of his duty and authority and inflicts an unjustifiable injury upon another."

And the same case cites with approval (l. c. 649), 2 Mechem on Agency, section 1960, p. 1523, as follows:

"In many cases no better definition can be given than the words themselves suggest. But, in general terms, it may be said that an act is within the course of the employment if (1) it be something fairly and naturally incident to the business, and if (2) it be done while the servant was engaged upon the master's business and be done, although mistakenly or ill-advisedly, with a view to further the master's interests, or from some impulse or emotion which naturally grew out of or was incident to the attempt to perform the master's business, and did not arise wholly from some external, independent and personal motive on the part of the servant to do an act upon his own account."

The quotation last above cited covers the situation here presented and is against defendant's contention. We think defendants have confused "line of duty" with "scope of employment." There is a clear distinction. The test is whether the acts done were within the scope of the servant's employment, not whether they were done while prosecuting the master's business. In Compher v. Telephone Co., 127 Mo. App. 553, 106 S. W. 536, this court makes this distinction, using the following language (l. c. 556):

"No principle is now more firmly established than that which holds the master responsible for the torts of the servant committed within the scope of his employment and as part of his service."

The opinion in that case quotes approvingly from Wood on the Law of Master and Servant, sec. 307 (l. c. 557):

"It is not necessary, in order to fix the master's liability, that the servant should, at the time of the injury, have been acting under the master's orders or directions, or that the master should know that the servant was to do the particular act that produced the injury in question. It is enough if the act was within the scope of his employment, and if so, the master is liable, even though the servant acted wilfully and in direct violation of his orders."

As in the Compher case, so in the case before us, the test to be applied is to ascertain whether the alleged tortious act of Hartig was one which reasonably and fairly may be said to have been an act of protection of the property admittedly under his charge, and not one so disassociated from his duties as foreman that it should be regarded as prompted alone by malice or wilfulness of the actor.

We are of opinion the act herein complained of was within the scope of Hartig's employment. This conclusion is supported by the following cases: Haehl v. Railroad, 119 Mo. 325; Meade v. Railroad, 68 Mo. App. 92; Collette v. Rebori, 107 Mo. App. 711; Railroad v. Milligan, 135 Ala. 205, 33 So. 438; Hartman v. Muehlebach, 64 Mo. App. 565; Farmer v. Railroad, 116 Mo. 81, 93; Hudson v. Railroad, 16 Kans. 470; Railroad v. Baum, 26 Ind. 70; Golden v. Newborn, 52 Ia. 59; Howe v. Newmarch, 94 Mass. 49; Rounds v. Railroad, 64 N. Y. 129.

To the same effect is the ruling in the Maniaci case from which we have quoted and wherein the court cites with approval the opinion of LORIGAN, J., in the case of Otis Elevator Co. v. Bank, 163 Cal. 1. c. 39, in part, as follows:

"It is the general doctrine of the law, as it is our statutory rule, that a principal is liable to third parties not only for the negligence of its agent in the transaction of the business of the agency, but likewise for the frauds, torts or other wrongful acts committed by such agent in and as part of the transaction of such business."

The rule applicable to the case at bar is clearly stated in Pierce on Railroads, pp. 277, 278, where it is said:

"The company is liable for the acts of its servants in the course of their employment, both in the rightful use and in the abuse of the powers conferred upon them; and when they keep within the course of their employment, it is responsible for their negligence or wrongful act, although they are acting against its instructions, or even wilfully."

For other definitions and application of the doctrine of *respondeat superior*, see 4 Words & Phrases (2 Ed.), 557, 558.

It is true that no general rule can be declared which will determine in each case whether the servant was acting within the scope of his employment; the authority from the master generally is to be gathered from the surrounding circumstances in each case.

"It is a principle embodied in the very relation of master and servant that whatever is done by the employee in virtue of his employment and in furtherance of its ends is deemed by the law to be an act done within the scope of employment." [39 C. J. 1283; Hinkle v. Railroad (Mo.), 199 S. W. 227.]

It is not essential that the act be specifically authorized by the master. [Boullon v. Gas Light Co., 148 Mo. App. 462, 129 S. W. 401.] An act is within the scope of the servant's employment where necessary to accomplish the purpose of his employment, and is intended for that purpose, although in excess of the powers actually conferred upon the servant by the master. [Chandler v. Gloyd, 217 Mo. 394, 415, 116 S. W. 1073.] A careful examination of the cases cited by defendants in support of their position that Hartig was not

within the scope of his employment when he committed the act complained of, shows they do not hold contrary to the rule above enunciated, and do not apply. We therefore hold the trial court was not in error in refusing the peremptory instructions offered in behalf of both defendants.

It is charged the court erred in giving plaintiff's instruction No. 3, which is as follows:

"The court instructs the jury as regards the use of the term 'without just cause' used in the instruction herein, that even though you should believe Pete La Bella took or was about to take junked cables of the telephone company, yet taking of cables of and the then money value of less than thirty dollars, even though you should so find such was taken, could constitute no more in law than a misdemeanor, and in this connection you are further instructed that no person not a regularly constituted officer of the law of and at the time and place in question could have the legal right or lawful authority to arrest or attempt to arrest and hold a person for the regularly constituted authorities even though such person might have committed a misdemeanor, and the act of one not an officer of the law in so doing under such circumstances would in law be illegal and without just cause."

Appellants urge that a private individual has power to make an arrest for a misdemeanor committed in his presence and that the instruction erroneously told the jury to the contrary. It is insisted the instruction is erroneous because no distinction is made between a misdemeanor committed in the presence of the person making the arrest and one committed out of his presence.

It is admitted there is no evidence tending to prove the value of the junk in issue here. It is also agreed that when Pete La Bella was shot he had none of the cable in his possession. It is admitted Hartig shot and killed the boy. Under the law applicable to the situation here presented, defendants are required to prove facts constituting a defense, to-wit, justification. Judge LAMM, in his imimitable way, states the law on this point in Morgan v. Mulhall, 214 Mo. 451, 459, 114 S. W. 4, 6, as follows:

". . . it has been held that in an action for damages from injuries caused by an unlawful and wrongful assault and shooting, plaintiff is prima-facie entitled to a verdict upon proof that he was shot by defendant; it then devolves upon defendant to show that the shooting occurred without fault on his part, or to put in evidence mitigating facts; it is not necessary that plaintiff, in the first place and by direct evidence, should show either an intention to commit the injury or that defendant was in fault. . . . That is to say, a plaintiff hit by a bullet, may identify the shooter, prove the hit and quit. At that point the burden shifts, and the law, as well as the good sense of it, puts the boot on defendant's foot and the labor-

ing oar in his hands—he must justify or otherwise lawfully excuse the shot.''

In Hartman v. Hoernle, 201 S. W. 911, it was held in effect that while one is entitled to resist a trespass upon his land, and the taking of his melons, the defendant was not warranted in using more force than necessary to eject the trespassers or to protect his property, and particularly not justified in unnecessarily assaulting plaintiff with a deadly weapon although plaintiff, when injured, was a trespasser and in the act of violating the law. [See also Gray v. Earls, 298 Mo. 116, 250 S. W. 567; McLaughlin v. Marlatt, 296 Mo. 656, 246 S. W. 548.] The right of private persons to make arrests depends upon the circumstances shown. There is no statute authorizing private persons to make arrests under the circumstances presented in this case. In this view of the matter and in the light of the citations above, we must hold there was no prejudicial error in giving plaintiff's instruction No. 3. From what we have said we may assume that decedent at most was only guilty of a misdemeanor, and therefore Hartig had no right to shoot him.

It is charged the court erred in refusing defendants' instructions E and F. The assignment is merely a charge without pointing out wherein the error lies. In this situation we are not required to sift the instructions in order to discover any latent error therein.

Appellants complain that the verdict is defective and erroneous in that there is no separate statement and finding as to compensatory and exemplary damages, citing section 1223, Revised Statutes 1919, which provides that where punitive damages are recoverable and allowed, the amount thereof shall be separately stated in the verdict. Section 1222 provides that the amount of exemplary or punitive damages be separately stated in the petition. We know no case holding that a pleader in an action for damages for death under the damage act should state separately in his petition the amount to be recovered by way of pecuniary loss and damages by way of penalty. The authorities hold to the effect that the amount of penalty to be assessed above the pecuniary loss is within the discretion of the jury.

Section 4219, Revised Statutes 1919, provides that in every such action—

''The jury may give such damages, not exceeding ten thousand dollars, as they may deem fair and just, with reference to the necessary injury resulting from such death, to the surviving parties who may be entitled to sue, and also having regard to the mitigating and aggravating circumstances attending such wrongful act, neglect or default.''

Under this statute any amount above compensation is penalty. It is clear that it is within the discretion of the jury to say how much compensation and penalty in the aggregate shall be included

in the award. [Grier v. Railroad, 286 Mo. 523, 228 S. W. 454.] We hold against defendant on this point.

Defendants charge that plaintiff's instruction was erroneous as to the form of the verdict, but what we have said rules this point against defendants' contention.

Finally it is urged the verdict was excessive, and therefore the court erred in refusing defendant's instruction C and D,. These were peremptory instructions to the effect that under the law and the pleadings and evidence plaintiff was not entitled to recover either actual or punitive damages. What we have already said determines the point against defendants.

Finding no reversible error of record, the judgment is affirmed. *Bland, J.,* concurs; *Trimble, P. J.,* absent..