Charles PARRINELLO, (Plaintiff) Respondent,

v.

**RULO INVESTMENT COMPANY, Inc.,** (Defendant) Appellant.

No. 30709.

St. Louis Court of Appeals.

Missouri.

Sept. 19, 1961.

Motion for Rehearing or to Transfer **to** Supreme Court Denied Oct. 17, 1961.

Heege & Heege and George Heege, III. Clayton, for appellant.

Joseph D. Feigenbaum and Max M. Librach, St. Louis, for respondent.

RUDDY, Judge.

This is an appeal by defendant from a verdict and judgment in favor of plaintiff

in the sum of $3,500 for personal injuries sustained.

Plaintiff alleged in his petition, which allegation was substantiated by the evidence, that while walking on a concrete walk, on premises owned and controlled by defendant, he was caused to fall when the outer edge of the walk crumbled and gave way under his foot. The negligence charged was that the walk "which crumbled and gave way under plaintiff's foot, was cracked, likely to crumble from ordinary use, dangerous and defective prior to plaintiff's above mentioned fall and defendant knew, or by the exercise of ordinary care could have known of such cracked, dangerous and defective condition of said portion of the concrete walk, and that it was likely to crumble, from ordinary use, for a sufficient time prior to plaintiff's fall, for defendant to have remedied and repaired" said defect.

The negligence as charged in plaintiff's petition was submitted to the jury for its finding and, as stated, resulted in a verdict for plaintiff.

No point is raised by defendant concerning its liability for plaintiff's injuries. Only two points are relied on by defendant, both dealing with the issue of damages only. Therefore, our statement of the facts will be limited to those relevant to plaintiff's injury.

Plaintiff was a bookkeeper for HIM, Inc. The fall took place October 30, 1958, on a walk in front of the office of HIM, Inc. Immediately after he fell, plaintiff felt a sudden and sharp pain in his right foot and he saw a little cut in the leather of his shoe on that foot. He took the shoe off and hobbled back to the office. Thereafter, his wife drove him home. He did not drive because he was in "too much pain" and could not get his shoe back on his foot. At home he soaked the foot in hot water and epsom salts and took anacin for relief of the pain. He got very little sleep that night because of the pain. The next morning his wife took him to the Veterans'

Hospital where an x-ray was taken of his foot. He was told by the doctor that he had "a broken foot" and would have to stay in the hospital. The x-ray revealed an evulsion fracture of the base of the fifth metatarsal of the right foot at the area of insertion of the peroneus brevis muscle. At the hospital plaintiff was found to have a minimal edema and tenderness over the dorsal aspect, especially over the base, of the fifth metatarsal. There was marked tenderness on palpation over the volar head of the fifth metatarsal and on forced plantar dorsal flexion of the foot. While in the Veterans' Hospital his foot was packed in ice and before leaving the hospital on November 3, 1958, his ankle was strapped. He was discharged on this date with instructions to return for follow-up examination and he was given a cane to use. His foot continued to have a throbbing pain. He returned to work the day following his discharge from the hospital. He did not use the cane given him at the hospital, but, instead, used crutches given him by his landlord. The crutches helped to keep the pressure off his foot. He continued going to work and used the crutches three or four weeks. After he discarded the crutches he used the cane for four weeks.

Plaintiff did not return to the Veterans' Hospital. He saw Dr. Joseph Fields, a chiropodist, who gave him whirlpool baths until February 1959. Later, plaintiff saw Dr. Samson Wennerman who gave him electric diathermy treatments. Plaintiff received momentary relief when undergoing these treatments, but, thereafter, the soreness in his foot would return, especially after using the foot in walking. He continued to experience sharp pain after he drove an automobile.

In September 1959 plaintiff saw Dr. Marshall B. Conrad, an orthopedic surgeon, who advised him to use a heating pad on the foot. When asked how he was getting along at the time of the trial, plaintiff said the foot was getting along pretty good, except when he tries to climb or use the foot to excess. He had to quit dancing and

playing golf. He has not bowled because of the pressure on his foot. All these activities he did to some extent before the injury. Whenever he and his wife take a long drive, his wife does the driving because of the pain in his foot when he drives too far. He had no pain or trouble with his right foot and experienced no difficulty in walking prior to the injury.

Dr. Joseph Fields, a chiropodist, saw plaintiff for the first time on November 10, 1958. His examination disclosed swelling and redness of the right foot. He treated plaintiff with hydrotherapy (whirlpool baths) for 32 days and also strapped his foot and ankle at intervals. The last time he saw plaintiff was February 10, 1959. On this date there was marked improvement in plaintiff's foot, but some swelling remained and pain was experienced on some movements of the toes. Dr. Fields did not know if the fracture healed over the period of his treatment.

Dr. Marshall B. Conrad, a specialist in orthopedic surgery, defined the term evulsion fracture as one which occurs when a portion of the bone involved has been pulled away from the remainder of the bone. He examined plaintiff on September 25, 1959. He took x-rays of the foot. There was no deformity shown and he could detect no abnormality clinically, except for two things. Plaintiff showed tenderness on pressure on the dorsum of the foot, that is, the top of the instep, and when he stood barefooted he showed a moderate tendency to pronation of both feet. Pronation, he said, was a tendency of the feet to sag a little in the long arch. He stated that the pronation he found was something plaintiff had all of his life and did not occur as a result of the injury. The x-ray pictures taken by him showed evidence of a healed fracture which involved the base of the fifth metatarsal ·and showed an area of irregularity in the edge of the bone and there was some change in the texture of the bone, which he explained was a result of the healed fracture. The fracture line appeared to have gone across the base of the fifth metatarsal. He found that the fracture had healed solidly and was in perfect position. When asked if this part of the foot which was injured bears the weight of the person standing, he testified that the whole foot takes part in the weight bearing when you stand on it. It was his opinion that plaintiff will continue to have the symptoms essentially as he is having them now.

Dr. Samson Wennerman examined plaintiff on two occasions. He first saw plaintiff February 21, 1959. He took an x-ray picture. His interpretation of the x-ray was a fracture of the fourth metatarsal of the right foot with some "slight displacement." Later, when his x-ray was examined by another doctor, the other doctor testified that the x-ray showed the fracture was in the fifth metatarsal of the right foot. When Dr. Wennerman was asked if he had any opinion as to whether the pain which plaintiff still experiences after certain activities will or will not be permanent, he answered, "I think he will continue to have trouble with his foot." It was his opinion that this pain and trouble will continue indefinitely. In addition to his x-ray findings Dr. Wennerman found some thickening of the foot at the region of the metatarsals and it was his opinion that this thickening would probably remain. He applied diathermy heat treatments to the foot.

Testifying for defendant was Dr. E. C. Funsch who examined plaintiff on October 9, 1959. He said plaintiff was 37 years of age and his complaint was limited to his right foot. In his examination he said plaintiff walked without any considerable difficulty. The right foot was the same size and shape as the left. Plaintiff complained of some tenderness when pressure was exerted over the proximal portion of the fifth metatarsal bone. Plaintiff had normal movement of the foot at the ankle and the toes. X-rays taken disclosed a small thin line at the base of the fifth metatarsal bone which he said indicated a fracture at the tip of that bone. He said that

the fracture had healed in perfect position and found no displacement and no deformity or restriction of movement as a result of the fracture. He found no objective evidence to indicate that plaintiff would have any permanent disability. He said it is possible that plaintiff still could have some discomfort in that foot.

In his first point defendant contends the trial court erred in giving and reading its instruction No. 6. At the threshold of our discussion, we feel compelled to state that the instruction attacked, although it seems to have been approved in decided cases, is not recommended for future use.

Defendant contends that the instruction permits the assessment of double damages in that it requires the jury to take into consideration plaintiff's age, the character, extent and severity of his injuries and the past and future pain and suffering in addition to the full amount of damages.

Plaintiff in his brief tells us that instruction No. 6 has been taken from and approved in the cases of Hilton v. Thompson, 360 Mo. 177, 227 S.W.2d 675, and Meierotto v. Thompson, 356 Mo. 32, 201 S.W.2d 161. Neither of these cases set out in full in the opinion the instruction under review. Plaintiff in his brief sets out in full the instruction attacked in the case of Hilton v. Thompson, supra. Plaintiff evidently obtained the instruction from the transcript of the record in that case and as set out in his brief it is similar to instruction No. 6 given in the instant case.

In the Meierotto case, supra, the instruction under review seems to be similar to the one under review in this case. In the instant case, as in the Meierotto case, defendant attacks the instruction on the ground that it directed the jury to assess double damages.

Plaintiff's instruction in the instant case told the jury that it should, "determine the full amount of the damages, if any, suffered by him directly and proximately in consequence of such injuries; and you should find the amount of damages to be such a sum of money as will fairly and adequately compensate him for such injuries."

As in the Meierotto case, the instruction in the instant case then proceeds to enumerate the various elements to be taken into consideration, such as plaintiff's "age and the character, extent, and severity of such injuries." Following this, the jury was told in the instant case that it "should consider the pain and suffering, if any, of body and mind, that you find and believe from the evidence that he (plaintiff) has endured up to the present time and the pain and suffering, if any, of body and mind that you find and believe from the evidence that it is reasonably certain he will endure in the future, in direct consequence of said injuries." The instruction did not ask the jury to consider any permanent injuries.

In the Meierotto case the instruction, practically speaking, paralleled in form and substance the instruction in the instant case, with the exception of the assessment of damages for permanent injuries. The Supreme Court in the Meierotto case held that the instruction did not direct the jury to assess double damages and approved the instruction and held that the giving of same did not justify a reversal of the judgment. The only difference, it seems, between the instruction under review and the one in the Meierotto case is that the instant instruction contains no provision for assessing damages for permanent injuries. Otherwise, they were similar in substance. Both permitted recovery for past and future pain and suffering in almost identical language.

Defendant contends that because the forepart of the instruction tells the jury that it "should determine the full amount of the damages" it is equivalent to telling it that in addition to giving plaintiff a sum that would fully compensate him for his injuries, the jury was told to give plaintiff an additional sum for past and future pain and suffering. We do not think the instruction is subject to such interpretation. We

think, when the instruction is read in its entirety, it tells the jury that in determining the full amount of damages to which it finds plaintiff is entitled, it should consider the pain and suffering plaintiff has endured and the pain and suffering that plaintiff is reasonably certain to endure in the future, as a consequence of the character, extent and severity of plaintiff's injuries. We do not believe the jury was misled in the respects complained of by defendant.

Defendant cites a number of cases in support of its contention, which declare principles of law with which there can be no dispute, but none of the cases involve an instruction with which we are dealing. Defendant acknowledges it has found no case in which the courts have considered an instruction precisely like the one before us. We think the Meierotto case involved an instruction similar to the one under review and the ruling in that case is controlling in the instant case. Also, in the case of Hilton v. Thompson, supra, the Supreme Court had before it a similar, if not identical, instruction to the one ruled on in the Meierotto case and again held that the giving of such instruction did not constitute reversible error.

■ Another contention urged by defendant in connection with instruction No. 6 is that the sentence following that telling the jury it should take into consideration plaintiff's age and the character, extent and severity of his injuries, begins with the the word "therefore," when further instructing the jury to consider past and future pain and suffering. It claims this is a misdirection. We think the word serves no useful purpose in the manner and place used, but we do not think it misled the jury. Defendant gives to the word "therefore" as used in the instruction the meaning "hence" or "because of that." We think the jury understood it to mean "for that reason, referring to something previously stated." Webster's New International Dictionary, Second Edition, Unabridged. That which was previously stated was their duty to

determine the full amount of damages and in doing so, in addition to considering the character, extent and severity of plaintiff's injuries, the instruction told the jury it should consider the past and future pain and suffering.

■ A final complaint against Instruction No. 6, charged by defendant, is that the instruction did not confine the jury to the facts found and believed by it from the evidence, but gave the jury a roving commission in regard to the injuries. We do not believe the jury was misdirected in this respect. In several places in the instruction the jury was limited to facts "that you (the jury) find and believe from the evidence." It is true that each and every time the court referred to injuries or damages the court did not follow such reference with the statement "as you believe and find from the evidence," but when the instruction is considered in its entirety we are reasonably certain the jury did not consider injuries not supported by the evidence and not caused by the fall. In this connection defendant states that there was injected into the case by plaintiff a condition of the feet known as "a tendency to pronation." There is nothing in the record to indicate that plaintiff "injected" this finding of Dr. Conrad into the case. The reference to the pronation found fell from the lips of Dr. Conrad as he was relating what he found in his physical examination of plaintiff's feet. He was quick to state in his direct examination that this condition was something plaintiff had all of his life and did not occur as a result of the injury and fall. It was not a statement reluctantly forced out of Dr. Conrad on cross-examination. To find that the jury did award or could have awarded damages for the "tendency to pronation" found by Dr. Conrad would be an affront to the intelligence of the members of the jury.

Instruction No. 6 was not a model instruction, as we have indicated, but we do not find that it contains the errors complained of by defendant.

In the second and final point relied on by defendant, it contends the verdict of $3,500 was grossly excessive. In determining the issue of an excessive verdict, we do not weigh the evidence but consider only the evidence and inferences most favorable to the plaintiff and to the jury's verdict which has had the approval of the trial court. Grimm v. Gargis, Mo., 303 S.W.2d 43, 74 A.L.R.2d 599. There is no precise formula for gauging whether a verdict is excessive. Each case depends upon its own facts. Brown v. Payne, Mo., 264 S.W.2d 341, 348. In determining whether a verdict is excessive, the test seems to be whether or not the size of the verdict is such as to shock the conscience of the court. Scheidegger v. Thompson, Mo.App., 174 S.W.2d 216, 222. Prior cases where the injury and its consequences are similar may be used as a standard in measuring whether or not the instant verdict is excessive. Defendant readily admits it has found no case with an injury and consequences similar to that before us.

Plaintiff sustained an evulsion fracture of the base of the fifth metatarsal of the right foot at the area of insertion of the peroneus brevis muscle. It was accompanied with some edema and marked tenderness in the area of the fracture. He had much pain for some time after he sustained the injury. He was compelled to use crutches and a cane for a period of two months. The whirlpool baths, diathermy and other heat treatments provided only momentary relief from the soreness and pain. These treatments, in succession, had been administered until shortly before the trial which was held abut 1½ years after the injury was sustained. Plaintiff continues to have sharp pain in the right foot, especially after walking or driving a long distance. He had to quit dancing, bowling and playing golf. Eleven months after the injury, when he was examined by Dr. Conrad, plaintiff had tenderness in the area of the fracture. The healed fracture showed some displacement, an area of irregularity in the edge of the bone and some change in the texture of the bone. There was some thickening of the foot in the region of the metatarsals which would probably continue. These findings by the doctors may be considered in determining the reasonable certainty of future pain and suffering. Dr. Conrad said plaintiff will continue to have tenderness in the area of the fracture and will continue to have pain. Dr. Wennerman said plaintiff will have trouble with the foot indefinitely.

In the case of Grimm v. Gargis, supra, plaintiff suffered a fractured eleventh rib, a sprain of the right shoulder, left wrist and of the right ligamentous muscle. He suffered a concussion and some lacerations and bruises. He was in the hospital four days and was treated by an osteopath 30 or 40 times. There was no proof of permanent injuries, medical expenses or loss of earnings. Plaintiff apparently had a satisfactory recovery of the fractured rib and the only injuries that offered any degree of trouble in the future were those to the muscles and tendons of plaintiff's right shoulder and back.

In the Grimm case (303 S.W.2d loc. cit. 54) the Supreme Court, in quoting from Burr v. Kansas City Public Service Co., 365 Mo. 115, 276 S.W.2d 120, 127, said:

"'There is no precise method for determining the maximum award which the evidence in this case will support. Each case must be considered upon its own peculiar facts. Due regard should be given to the purchasing power of the dollar, to the rule of reasonable uniformity of awards for similar injuries and to the fact that the jury and the trial judge were in a better position than this court to measure an award of reasonable compensation, as well as to the fact that the trial court has approved the verdict in question.'"

In the Grimm case the Supreme Court refused to adopt a recommended remittitur of $3,000 and affirmed the verdict in the sum of $10,500.

Plaintiff's injuries in the instant case are not comparable in extent to the injuries involved in Grimm v. Gargis, supra, neither is the size of the verdict. In both cases the fractures healed well, only soft tissue injuries remained. When consideration is given to the verdict in the Grimm case of $10,500, which was affirmed, we cannot say that the verdict in the instant case is excessive. We think the verdict of $3,500 is reasonable in view of the nature of the injury, the past pain and suffering and the likelihood of continued pain and suffering into the extended future.

The judgment of the trial court is affirmed.

ANDERSON, P. J., and WOLFE, J., concur.