Ralph N. MATTA, Plaintiff-Respondent,

v.

Charles Edwin WELCHER and Joe Harding, Incorporated, Defendants-Appellants.

No. 8224.

Springfield Court of Appeals.

Missouri.

Feb. 10, 1965.

John R. Martin, Rex Titus, Richart, Titus & Martin, Joplin, for defendants-appellants.

Karl Blanchard, Robert E. Seiler, Seiler, Blanchard & Van Fleet, Joplin, Graham W. Rogers, Lynch & Rogers, Shreveport, La., for plaintiff-respondent.

HOGAN, Judge.

This is an action for personal injuries resulting from the collision of two motor vehicles. The jury returned a verdict for the plaintiff and against both defendants in the sum of $8,000.00. After an unavailing motion for new trial, the defendants have appealed.

The accident in question occurred shortly after 9:00 A.M. on March 22, 1962, either on or near the edge of Highway 71 in McDonald County, about one mile north of the Missouri-Arkansas boundary. At the time, it was fully light and the visibility was described as "unlimited."

At the place involved, the highway is a two-lane blacktop highway running generally north and south and is approximately 27 to 28 feet wide. To the east of the highway, running parallel, there is a gravel driveway or parking area, and at the east edge of the gravel area there are a number of business establishments, one of which is referred to as Hillcrest Manor, or "the liquor store." The highway appears to be straight in this vicinity, but some distance south of the point of collision the road slopes or inclines to the south. During trial, considerable emphasis was laid by the parties upon the "sight distances" to the south from the point of collision, but it is sufficient here to say that from the approximate point of impact near the east edge of the highway and about 20 feet north of the liquor store, a car coming north could be seen at least 355 to 360 feet away.

At the time of the accident, defendant Welcher, admittedly on company business, was traveling south. Mr. Welcher, a salesman, intended to call at the Hillcrest Manor to attempt to sell a "walkin cooler." The plaintiff and four companions, all members of the Air Force, were riding north in an automobile owned by one of the group and being driven by another. The airmen, including the plaintiff, were on the way from their base near Shreveport, Louisiana, to Des Moines to participate in a bowling tournament.

The plaintiff's theory of submission, broadly speaking, was that the defendant failed to observe the plaintiff's vehicle approaching from the south and turned left across the highway directly into its path, thereby causing the collision. Plaintiff's evidence was that he and the members of his group had begun their trip about midnight, and about 7:00 A.M. had stopped for breakfast "some place in Arkansas." After breakfast, a Sgt. Curtis took over the driving and continued driving until the accident occurred. The plaintiff, seated in the front seat, had been dozing until a moment or so before the accident; he shut his eyes in anticipation of the impend-

ing collision and did not see the two vehicles collide.

As Sgt. Curtis related the incident, he was driving north, and as he "crested the slope, or hill" he saw the defendant's vehicle entirely in the west (southbound) lane traveling south. Curtis estimated his speed, when he first saw the oncoming vehicle, to be about 60 to 65 miles per hour. The defendant, when first seen by Curtis, gave no sign of any intention to turn left. When the plaintiff's vehicle had come within 150 to 200 feet of the defendant, as Curtis estimated the distance, the defendant's vehicle "started to edge across" the pavement. Curtis applied his brakes and sounded his horn. Finding himself unable to slacken his speed sufficiently to avoid the collision, Curtis turned his automobile to the right when he came within "maybe six or ten feet" of the defendant, because he thought that "by turning, we'd sort of roll with the punch, rather than hit him head on." The attempt to turn the vehicle aside was to no avail, "had no effect on the automobile whatever, sliding," and the plaintiff's vehicle, still skidding, struck the defendants' vehicle "broadside" near the east edge of the pavement and "ended up" on the east side of the highway, "out in the gravel area."

As the defendant recalled the collision, he had started to turn left about 20 feet north of the liquor store, having looked for traffic ahead and behind, then "flipped on [the] signal light," and began to turn. When Welcher was "over the line two or three foot," he observed the other vehicle coming toward him "at a pretty high rate of speed." After a "moment of hesitation," Mr. Welcher concluded he had "a better chance" to avoid the collision by attempting to complete his turn than by attempting to turn aside, so he "immediately stepped down on [the] passing gear" and "got off the highway as fast as [he] could."

In any event, the two vehicles collided either near the east edge of the paved part of the road or a few feet off the road to the east, and the plaintiff, riding in the front seat, was injured when the two vehicles struck. Other facts will be more specifically noted in the course of the opinion.

The defendants first maintain that the trial court erred in refusing to receive evidence tending to show the average speed of the plaintiff's vehicle during that part of the trip preceding the accident. The defendants' position is that the first 350 to 375 miles of the trip had been covered in such a short time, considering the nature of the route taken, as to indicate consistent negligence and recklessness in the operation of the plaintiff's vehicle. They call our attention to the fact that they were not, by this evidence, attempting to show excessive speed at the very time of the accident, but instead argue that their tendered evidence indicates Sgt. Matta either acquiesced in or failed to protest against the consistently negligent and imprudent operation of the vehicle in which he was riding, and therefore tends to show contributory negligence on his part. The defendants distinguish the principles involved from those considered in Douglas v. Twenter, 364 Mo. 71, 259 S.W.2d 353, and cite us to Happy v. Blanton, Mo., 303 S.W.2d 633; Cunningham v. Pulver, Mo., 327 S.W.2d 227; and State v. Feger, Mo., 340 S.W.2d 716.

It was developed during the trial that the plaintiff and his companions had begun their trip between midnight and 1:00 A.M. and had traveled 350 to 375 miles before becoming involved in this casualty. They were riding in a 1959 Pontiac, apparently in good condition. This automobile belonged to one Ed Shadler, who drove during the first six or seven hours of the journey. During that time, several stops were made for coffee and gasoline, and the group paused to have breakfast "some place in Arkansas" about 7:00 A.M. There is no evidence to indicate what their maximum or minimum speed was during the time preceding the accident, and the witnesses were unable to recall with any certainty the condition of the route or routes over which they had traveled. Sgt. Curtis' estimate was that they had traveled the first 350 to 375

miles since "a few minutes after midnight," while plaintiff was of the opinion that they left about 1:00 A.M. Shadler did not testify. The accident happened shortly after 9:00 A.M.

The defendants called Sgt. Victor McKee, a member of the State Highway Patrol, and, having shown that he was familiar with Highway 71 between Shreveport and Jane, Missouri (near the place involved here), offered to prove "the condition of the road, the towns that you have to go through [and] the speed limits in Arkansas and Louisiana," for the purpose of showing that Sgt. Matta and his companions "must have exceeded the speed limit," and because "these boys were on a joint venture, and they all would have equal right of control." This offer was refused.

We have no doubt that the precedents cited by the defendants announce sound principles, but it is unnecessary to review them here. Likewise, it is unnecessary to consider in detail the various situations in which evidence may be received concerning the manner of driving prior to reaching the scene of an accident. Admittedly, precedents can be found indicating that in some cases evidence of excessive speed, particularly over a dangerous or poorly maintained route, may indicate negligence, e. g., Atlantic Coast Line R. Co. v. Pidd, 5 Cir., 197 F.2d 153, 156 [11], and South Texas Coaches v. Eastland, Tex.Civ.App., 101 S.W.2d 878, 883 [11], but those cases involve considerations very different from those involved here. We also bear in mind that the defendants sought to impute contributory negligence to Sgt. Matta as a member of a joint enterprise, and we think there could conceivably be a case in which evidence of a co-enterpriser's failure to protest or warn the driver would be admissible to show imputed contributory negligence, if the vehicle had been operated at an excessive speed

and in a reckless manner for some distance prior to reaching the scene of the accident. Clay v. Sammons, Ky., 239 S.W.2d 927, 930 [1]; Anno., 46 A.L.R.2d 23, 56–57.

It is another matter to say that the trial court erred prejudicially in excluding the defendants' tender. We consider it obvious that at some antecedent point in time and distance, evidence of the manner in which the plaintiff's vehicle had been driven would become so remote as to be wholly inadmissible. There had been interruptions in the continuity of movement of the plaintiff's automobile and, at one point, a change of drivers. Evidence of the conduct of a wholly different driver at some distant point would not only have been logically irrelevant; its admission would have been downright prejudicial to the plaintiff, if only because contributory negligence cannot be proved by showing similar prior acts of negligence.[1] Even disregarding the vagueness and generality of defendants' offer of proof, and assuming that it might have been logically relevant upon the pleaded issue of imputed contributory negligence, had it been more fully developed, still the fact that evidence is logically relevant in some degree does not imperatively require its admission where, as here, the probative value of the evidence is slight and its admission involves consideration of many collateral matters which are remote in time and conjectural in their nature. Conley v. Kaney, Mo., 250 S.W. 2d 350, 353 [3, 4]; McDonald v. Kansas City Gas Co., 332 Mo. 356, 369, 59 S.W.2d 37, 43 [14] [15]. The defendants' tendered evidence would not only require consideration of the nature of 375 miles of highways, some far distant from the point of collision, but would involve the jury in speculation whether a particular speed—not necessarily constant—was negligent under whatever unknown traffic conditions existed on those highways at the time plaintiff's party travel-

---

1. McComb v. Vaughn, 358 Mo. 951, 957–958, 218 S.W.2d 548, 552 [6–8]; Hodges v. Hill, 175 Mo.App. 441, 448, 161 S.W. 633, 634–635 [1, 2]; Calcaterra v. Iovaldi, 123 Mo.App. 347, 353, 100 S.W. 675, 676–677; I Wigmore, Evidence, § 199, pp. 677–681 (3rd ed. 1940); 38 Am.Jur., Negligence, § 316, p. 1015.

ed over them. Beyond that, there had been at least two drivers during the period covered by defendants' tender. We believe the offer of proof was properly rejected.

The defendants' next two assignments of error present more difficult questions. The defendants say that the trial court wholly refused to submit the issue of plaintiff's contributory negligence, the existence of a joint enterprise, and the issue of imputed contributory negligence to the jury for their consideration, and that this refusal was error. The difficulty presented is that the record is somewhat ambiguous as to the trial court's intended ruling, and the defendants' assignments of error in their brief are so imperfectly developed that we cannot fairly reach the points they attempt to present.

The defendants maintained all along that the plaintiff was barred from recovery, either by his contributory negligence as an ordinary guest passenger or by imputed contributory negligence as a member of a joint enterprise. They made some proof on these issues. They presented a motion for directed verdict at the close of all the evidence, but it contains no reference to contributory negligence. They did formulate and offer a number of instructions dealing with their pleaded defenses. These instructions were refused by the trial court. The court remarked that the tendered instructions—on both kinds of contributory negligence—were being refused because it felt there was no substantial evidence upon which to base such instructions. Upon further inquiry whether the court would refuse any instruction counsel "would attempt to draw," the court understandably objected "to counsel endeavoring to put the court on any such spot." As we have indicated, the defendants take this as an outright refusal to charge the jury in any manner on their pleaded defenses.

■■ Possibly the trial court's remarks were so intended. In any event, we can understand counsel's reluctance to press the matter to the point of discourtesy or seeming disrespect. So far as ordinary contributory negligence is concerned, we agree with the trial court that no substantial jury question was made. The circumstances which the defendants would have had the jury consider on this issue were, at least in part, too remote to have a logical bearing on plaintiff's contributory negligence at the time of the accident. What is more, we think the defendants mistook the duty imposed on the plaintiff as a guest passenger, if that was his status. While a guest has the duty to warn the driver of dangers which are reasonably manifest or known to the guest in the exercise of ordinary care, the guest is under no obligation to keep a constant lookout and make continuous suggestions. Jenkins v. Wabash R. Co., Mo., 322 S.W.2d 788, 799 [14, 15]; Ketcham v. Thomas, Mo., 283 S.W.2d 642, 645 [1, 2]; Toburen v. Carter, Mo., 273 S.W.2d 161, 165 [6, 7]. The defendants argue that Sgt. Matta was obliged, in the circumstances, to remain awake and alert, but there is nothing in the record to suggest that such vigilance was required in the exercise of ordinary care, and we conclude that no jury question was made on the issue of plaintiff's contributory negligence as a guest passenger.

The existence of a joint enterprise is another matter. Plaintiff and the other occupants of the vehicle were members of a bowling team, and they were going to Des Moines for the express purpose of participating in a bowling tournament. It is inferable that plaintiff and his companions were members of a larger group, for plaintiff's witnesses mentioned another vehicle, a "station wagon," also being driven to Des Moines, in which the bowling equipment was stored.

At midnight, or shortly thereafter, plaintiff and the other members of the bowling team (Shadler, Curtis, Rice and Lippincott) met at a local bowling alley. They agreed that they would use Shadler's car for the trip "since his family wasn't there." It was also agreed that each member of the party except Shadler would contribute $10.00 each "to take care of the gas and oil." Though

it' does not appear that the group agreed upon a route by name or number, they had agreed to "drive straight through," and that they would "trade off on driving and sleeping in the car." Shadler, the owner' of the car, started driving and drove for the first six or seven hours of the trip. During that period, the other occupants of the vehicle conversed or slept. Either three or four stops of unspecified duration were made for coffee and gasoline. When a stop was made for breakfast "some place in Arkansas," 'Curtis asked Shadler if he "wanted a little relief for a while," and Curtis thereupon took over the .driving. Curtis was driving when the accident occurred.

 It is no longer open to question in this jurisdiction that if an occupant of a motor vehicle is engaged in a joint enterprise with the driver and is injured through the concurrent negligence of the driver and some third person, the contributory negligence of the driver, if any, is imputable to the occupant and will bar recovery from the third person.[2] This is true whether or not the trip is made for a business purpose.[3] We are of the view that the evidence, taken as a whole, permits the inference that there was a joint enterprise between Sgt. Matta and his companions. They had an agreement to share expenses, a common·destination, a common purpose in making the trip, an apparent agreement to proceed over a particular route, and an agreement to alternate in the operation of the vehicle. Doubtless much authority could be found to the effect that no one of these 'considerations would establish the existence of a joint enterprise as a matter of law, or conclusively as a matter of fact. Nevertheless, we conclude that a jury question was made on this issue.[4]

 The trouble with defendants' position on this appeal is that they have not sustained their burden of establishing reversible error upon the record. Even though the defendants' evidence made an issue on their pleaded defenses, they were still under a duty to formulate and tender correct instructions' on those subjects, Anderson v. Welty, Mo.App., 334 S.W.2d 132, 140 [16], and the trial court was under no duty to give their instructions unless they were substantially correct. Southwestern Bell Telephone Co. v. Chester A. Dean Co., Mo., 370 S.W.2d 270, 279 [10, 11]. We are sure the appellants recognize those rules for they formulated and submitted a number of instructions on the subject of imputed con-

2. Donahoo v. Illinois Terminal R. Co., Mo., 275 S.W.2d 244, 251 [7]; Mendenhall v. Neyer, 347 Mo. 881, 893, 149 S.W.2d 366, 374 [13]; Pence v. Kansas City Laundry Serv. Co., 332 Mo. 930, 939, 59 S.W.2d 633, 636 [8, 9]; Smith v. Wells, 326 Mo. 525, 547–548, 31 S.W.2d 1014, 1025 [12]; Tannehill v. Kansas City, C. & S. Ry. Co., 279 Mo. 158, 170–172, 213 S.W. 818, 821–822 [3]; Roddy v. Francis, Mo.App., 349 S.W.2d 488, 491 [1]; James v. Berry, Mo.App., 301 S.W.2d 530, 531 [1]; Counts v. Thomas, Mo.App., 63 S.W.2d 416, 419.

3. Smith v. Wells, supra, 326 Mo. at 547–548, 31 S.W.2d at 1025 [12] ("a joint journey . * * * either of business·or pleasure") ; Tannehill v.·Kansas City, S. & C. Ry. Co., supra, 279 Mo. at 172, 213 S.W. at· 822 ("upon either pleasure or business bent * * *") ; James v. Berry, supra, 301 S.W.2d at 531 [1] (fishing and sight-seeing trip) ; Roddy v. Francis, supra, 349 S.W.2d at 491 [1] (sight-seeing trip) ; Counts v. Thomas, supra, 63 S.W.2d at 419 ("a common purpose * * * whether for business or pleasure * * *").

4. Coleman v. Bent, 100 Conn. 527, 124 A. 224, 225–226 [2, 3] [4]; Grubb v. Illinois Terminal Co., 366 Ill. 330, 8 N.E. 2d 934, 938–939 [11]; Greenwell's Adm'r v. Burba, 298 Ky. 255, 182 S.W.2d 436, 440–441 [6, 7] [8] ; Derrick v. Salt Lake & O. Ry. Co., 50 Utah 573, 168 P. 335, 337 [2]; Prosser, Torts, § 65, p. 366 (2d ed., 1955) ; Restatement, Torts, § 491, comments (c) and (g), pp. 1274, 1277. See also Weintraub, The Joint Enterprise Doctrine in Automobile Law, 16 Cornell L.Q. 320, 330 (1931): " * * * normally it is a question for the jury whether the driver has, by virtue of the agreement to share expenses and the other circumstances, relinquished his exclusive right of control."

tributory negligence and the existence of a joint enterprise. The defendants went further and, in their motion for new trial, objected to the trial court's refusal to give certain of their tendered instructions and sought generally to justify the requests they had made. In this court, however, they simply make the point that "the court erred in ruling as a matter of law that plaintiff was not engaged in a joint venture," and point to no specific request or requests which were erroneously refused. In net effect, they have simply laid a number of tendered instructions before this court with the argument that one of them should have been given; they do not say which one, nor why. Rule 83.05,[5] relating to the contents of briefs, not only contemplates a particular statement of the errors complained of, but specifically requires that if a point relates to the refusal of instructions the instructions requested be set forth. Quite aside from this, sound appellate practice makes it incumbent upon the appellant who assigns error to the refusal of instructions to call attention in his brief to the specific request which was erroneously refused, and to show why it was error to refuse it in the circumstances of the case.[6] Otherwise, a respondent is deprived of a fair and reasonable opportunity to answer the points made by an appellant, and if the appellate court undertakes to make an independent search of the record for error, it becomes to that extent an advocate for the appellant, which in itself is unfair to the respondent. Morris v. Willis, Mo., 338 S.W.2d 777, 780; Ambrose v. M. F. A. Co-operative Ass'n Mo., 266 S.W.2d 647, 650. We are reluctant not to rule matters on their merits, but since the defendants have not developed their points relating to the existence of a joint enterprise and imputed contributory negligence specifically, we cannot fairly reach the question of prejudicial error in the trial court's refusal of these instructions.

The defendants next assign error to the giving of plaintiff's Instructions 3 and 4, maintaining that they do not hypothesize sufficient facts to guide the jury in determining whether the defendants were negligent, but merely give the jury a "roving commission to speculate and to make their own determination as to what conduct constitutes negligence."

Plaintiff's Instructions 3 and 4 were his principal verdict-directing instructions. Instruction 3, after abstractly advising the jury of defendant Welcher's duty to maintain a careful and vigilant lookout ahead, and advising them that there was no dispute that Mr. Welcher did turn left across the highway, then continued by telling the jury that if they found that " * * * when defendant Welcher was at * * * the point * * * where he began his left turn, [plaintiff's vehicle] * * * was so close that the making of a left turn by defendant Welcher would create a traffic hazard of imminent collision * * * and that plaintiff's automobile was in a position * * * where defendant Welcher * * * could have seen plaintiff's oncoming car * * * and [defendant] * * * failed to see said oncoming car * * * until after defendant Welcher had turned left * * * and was negligent * * * and * * * that said negligence, if so, directly contributed in causing the casualty," then their verdict would be for the plaintiff. Instruction 4, after advising the jury that the driver of a motor vehicle intending to make a left turn into a private road or driveway must yield the right-of-way to any oncoming vehicle approaching so closely that the making of a left turn would create a traffic hazard, and advising them that there was no dispute

5. All references to statutes and rules are to RSMo (1959), V.A.M.S. and V.A.M.R., unless otherwise noted.

6. Hamilton v. Crowe, 175 Mo. 634, 645, 75 S.W. 389, 392 [5]; University Bank v. Major, 229 Mo.App. 963, 969, 83 S.W. 2d 924, 928 [10]; LaBella v. Southwestern Bell Telephone Co., 224 Mo.App. 708, 716, 24 S.W.2d 1072, 1077 [7]; Jesel v. Benas, 177 Mo.App. 708, 713–716, 160 S.W. 528, 529–530 [2, 3].

that the defendant was driving south with the intention of making a left turn, and was then acting as defendant Harding's agent, continued, in substance: " * * * if you find * * * that when the vehicle operated by * * * Welcher was at * * * the point [where defendant Welcher] began his left turn * * * plaintiff was approaching * * * in a position to be seen * * * and was so close that the making of a left turn * * * would create a traffic hazard of imminent collision * * then it was the duty of defendant * * * to yield the right of way * * * and if you find that said defendant failed to do so * * * and was negligent * * * and * * * as a direct result of such negligence * * * the vehicles collided," then their verdict would be for plaintiff.

The defendants' argument in this connection is that both instructions are too abstractly stated. They say that the relative speeds and locations of the two vehicles should have been hypothesized along with the point of impact in relation to the highway, and that the instructions merely set out a general principle of law and then tell the jury that if they find the defendant violated that standard, he is negligent, without specifically hypothesizing the circumstances in which Mr. Welcher acted.

 We consider the defendants' criticisms to be without substantial merit. In the first place, the instructions are supported by the evidence, taken from the plaintiff's point of view. A jury could have found that as the plaintiff was riding north on a straight highway at a time when there was no other traffic on the road, and visibility was almost unlimited, the defendant turned left across the highway in front of the plaintiff, and a collision resulted. Plaintiff's vehicle was visible some 355 to 362 feet south of the point where Mr. Welcher began to turn, and presumably could have been seen for an appreciable interval before

the turn was commenced. Mr. Welcher began to turn when the plaintiff's vehicle was within 150 to 200 feet away, and it was then too late for the plaintiff's vehicle to stop short of a collision, although it was being driven within the speed limit. A jury could have inferred that defendant Welcher failed to see the oncoming, plainly visible automobile until he was "probably over the [median] line two or three foot" and that he then "elect[ed] to go on" and immediately "stepped down on [the] passing gear" to "get off the highway as fast as [he] could." Plaintiff's basic theory of submission seems to have been that the defendants' duty was governed by Section 304.021 (6), which requires a vehicle intending to make a left turn in these circumstances to yield the right-of-way to any vehicle approaching from the opposite direction when the making of a left turn would create a traffic hazard; both Instructions 3 and 4, it will be seen, essentially submit a violation of that statute, in slightly varying language. Both submit defendant Welcher's turn as being negligent because he turned when plaintiff's vehicle was "so close that the making of a left turn would create a traffic hazard of imminent collision," and appear to be based on the premise that whether defendant Welcher saw the plaintiff's vehicle approaching so close at hand as to create danger of a collision if he turned, but turned anyway (Instruction 4), or saw plaintiff's vehicle and appreciated the hazard imperfectly, and attempted to outrun it (Instruction 3) he could be guilty of negligence in violating Section 304.021(6). In this particular instance, we think plaintiff's premise was sound. Cf. Smith v. D. C. Transit System, Inc., D.C.Mun.App., 153 A.2d 658, 660 [3] [4].

Aside from such considerations, however, we are of the view that plaintiff's factual hypothesis was sufficient.[7] Although, as we have said, a verdict-directing instruction must hypothesize and require a finding of

7. It will be understood that the law being applied here pertaining to the form and sufficiency of instructions is that which applied prior to the effective date of present Rule 70.01.

all the elements essential in law to establish the proposition upon which the verdict is based, Gaffner v. Alexander, Mo., 331 S.W.2d 622, 627 [3]; Carson v. Evans, 351 Mo. 376, 379, 173 S.W.2d 30, 31 [1]; Ritchie v. Burton, Mo.App., 292 S.W.2d 599, 609–610 [13], these instructions do not submit a bald legal conclusion to the jury. The submission of defendants' liability was based on a statutory violation, and generally it is sufficient to couch the verdict-directing instruction substantially in the language of the statute, unless the evidence establishes an excusable violation (which is not the case here) or the statute itself creates a standard of conduct so ambiguous that it calls for judicial construction. May v. Bradford, Mo., 369 S.W.2d 225, 228–229 [7] [8]; Miles v. Gaddy, Mo., 357 S.W.2d 897, 902 [5]; see Pender v. Foeste, Mo., 329 S.W.2d 656, 660–661 [6]; Gaffner v. Alexander, supra, 331 S.W.2d at 626–627 [2]. In this case, the plaintiff's required finding was that defendant Welcher turned when plaintiff was "so close that the making of a left turn * * * would create a traffic hazard of imminent collision." This is substantially the language of the statute.

We agree with defendants that the scope of defendant Welcher's duty to the plaintiff at some particular, specific point in his progress across the highway might have been more precisely stated if the relative positions of the two vehicles, the speed of plaintiff's approaching vehicle, and the manner and dispatch with which the turn was being made, had all been hypothesized, but we cannot agree that it was necessary or even desirable to hypothesize the facts in such detail. The instructions do not declare that violation of the statute is negligence, but require the jury to find as a fact that plaintiff's vehicle was "approaching so closely as to create a traffic hazard of imminent collision," and require a finding that Welcher's turn at such a time was negligent. Since the statutory provision itself, in this case, is specific and unambiguous, Scott v. Gray, Mo., 337 S.W.2d 38, 42 [4, 5]; Creech v. Blackwell, Mo., 318 S.W.2d 342, 350 [6],

it is our view that plaintiff's hypothesis of the negligent act charged is explicit, at least to the degree required by current authority, and is not open to the charge that it creates a "roving commission" by its generality. May v. Bradford, supra, 369 S.W.2d at 228–229 [7] [8]; Miles v. Gaddy, supra, 357 S.W.2d at 902 [5]; Creech v. Blackwell, supra, 318 S.W.2d at 350 [6]. Further, we have some doubt of the accuracy of an instruction which would limit the defendants' duty to "yield the right-of-way" to some particular point in the progress of his left turn. As we construe the statute, Welcher's duty to yield arose when it reasonably appeared (or should have appeared) that plaintiff's approach had then created a "traffic hazard," or as it was expressed here, "a traffic hazard of imminent collision," and continued so long as it was possible for him to have stopped, slackened, or turned aside to let plaintiff's vehicle pass. Herr v. Ruprecht, Mo., 331 S.W.2d 642, 648–649 [5, 6] [8, 9]; Wilson v. Toliver, 365 Mo. 640, 652, 285 S.W.2d 575, 582 [10]. We conclude there was no prejudicial error in giving Instructions 3 and 4 on behalf of the plaintiff.

The defendants' final assignment is that the verdict is excessive. They contend that the verdict is excessive by the sum of $4,500.00 and cite Rauch v. McDonnell Aircraft Corp., Mo.App., 303 S.W.2d 226 and Parrinello v. Rulo Investment Co., Mo.App., 349 S.W.2d 416, as authority for their position.

There is no question here that the plaintiff was injured, although it is not clear how he sustained his injury, which was described as rather "uncommon." After the collision, the plaintiff found himself unable to walk; he discovered that his left shoe was off and his foot was swollen on top. He was taken to a hospital in Neosho, Missouri, where clinical and X-ray examination disclosed that he had sustained a complete dislocation or "avulsion fracture" of the second cuneiform bone, with a chip fracture of the cuboid bone. These two bones, along

with five others, form the posterior half of the skeleton of the foot. Though we are not anatomical experts, as we understand it, these small bones, together with a complex system of ligaments which bind them together, form part of the longitudinal and transverse arches of the foot, which function to take the jar out of walking and give resiliency in weight bearing. Dislocation of these bones, or tearing and stretching of the ligaments which bind them, can cause disturbance of the ability to walk or stand properly. In this case, the second cuneiform bone was completely dislocated, or "popped clear out of its bed," and it was necessary to reduce the dislocation by open reduction. This was done, and on the following day the left foot and leg were enclosed in a plaster cast and Sgt. Matta was returned to his base. Dr. Carter, who first examined and treated the plaintiff, stated that he considered the injury to be a "severe" injury. The injury undoubtedly caused pain at the time. There is some weakening of the arch structure of the left foot. The plaintiff also associates a sprained back or some back strain with the injury.

In his brief, the plaintiff stresses that he is an electrician in the Air Force and that his work requires him to stand on the balls of his feet, or to squat in somewhat cramped positions, and that this activity sometimes causes pain in his left foot. He argues here that quite possibly in the future he will require an operation to "fuse" the bones in his foot, and that arthritis might develop at the site of the chip fracture. Qualified physicians gave evidence that such were the possibilities; but viewing the evidence most favorable to the plaintiff, as we do, we find ourselves unable to say that the possibility of the development of arthritis in plaintiff's foot or the likelihood that further surgery will be required are anything more than contingent or possible consequences, which of course are not properly compensable in damages. The plaintiff's testimony clearly shows that he was apprehensive concerning his ability to remain in his present position, without reclassification, and eventually to retire and receive retirement benefits, but we are unable to find any record indication. showing with any reasonable certainty that he is likely to become disabled in the future as a result of this injury so as to lose his present classification or the benefits he expects to accrue from it.

Sgt. Matta testified that he was not restricted in any way from doing any job in the Air Force at the time of trial. There are no restrictions to any type of duty on plaintiff's medical record, and except for a period of three months following the accident, he has been on regular duty. Air Force physicians know of his injury but their "form of treatment" has been to tell plaintiff to "do what you can do." The back injury or condition which plaintiff associated with the accident had, at trial time, given the plaintiff no trouble for over two months. The plaintiff still bowls but is not on a bowling team. He still plays golf; he "used to be able to play 27 and 36 holes, sometimes, but can't get past 18, now."

 It would probably serve no useful purpose to reiterate all the basic rules by which we are guided in determining whether a verdict under review is excessive, beyond saying that it is primarily the function and prerogative of the jury to award an injured plaintiff such sums as will reasonably compensate him, and the appellate power to reduce a verdict should be exercised with caution, particularly where the trial court has refused to order a remittitur. Turner v. Yellow Cab Co. of Springfield, Mo.App., 361 S.W.2d 149, 157–158. The authorities recognize, however, that the courts are interested in "reasonable uniformity of awards" for similar injuries. Johnson v. Missouri-Kansas-Texas R. R. Co., Mo., 374 S.W.2d 1, 6 [8, 9]. Having considered the diminished purchasing power of the dollar and cases involving awards

of damages for reasonably similar injuries,[8] we conclude that the verdict is excessive in the sum of $4,000.00. If, therefore, plaintiff will remit the sum of $4,000.00 within fifteen days, the judgment will be affirmed, as of the date of its rendition, for $4,000.00; otherwise the cause will stand reversed and remanded for a new trial on all issues. It is so ordered.

RUARK, P. J., and STONE, J., concur.

8. Parrinello v. Rulo Investment Co., supra, 349 S.W.2d 416, 421, 422 [4-7] [8]; Cline v. City of St. Joseph, Mo.App., 245 S.W.2d 695, 701-703; Moses v. Kansas City Pub. Serv. Co., 239 Mo.App. 361, 378-379, 188 S.W.2d 538, 548-549; Sloan v. Farmer, Mo.App., 168 S.W.2d 467, 472 [10].